United States Court of Appeals,

Fifth Circuit.

Nos. 93-1101, 94-10787.

GATEWAY TECHNOLOGIES, INC., Plaintiff-Appellee,

v.

MCI TELECOMMUNICATIONS CORP., Defendant-Appellant.

MCI TELECOMMUNICATIONS CORP., Plaintiff,

v.

GATEWAY TECHNOLOGIES, INC., Defendant.

Sept. 27, 1995.

Appeals from the United States District Court for the Northern District of Texas.

Before JOLLY, JONES and DeMOSS, Circuit Judges:

EDITH H. JONES, Circuit Judge.

MCI Telecommunications Corp. ("MCI") appeals a district court order affirming the judgment of an arbitrator who found that MCI breached its contract with Gateway Technologies, Inc., ("Gateway") and awarded attorneys' fees as actual damages as well as $2,000,000 in punitive damages. MCI contends that its contract with Gateway provides for de novo review by this court of the errors of law in the arbitration award and urges vacation of the entire award, claiming that the arbitrator improperly assessed both attorneys' fees and punitive damages as well as excluded critical evidence. While we agree that the contract provides for de novo judicial review of "errors of law" in the arbitration award, this court vacates only the punitive damages and otherwise affirms the arbitration award.

1

## I. FACTUAL BACKGROUND

During 1990, the Virginia Department of Corrections ("VADOC") solicited bids to design and implement a telephone system that would enable inmates to place collect calls to authorized individuals without operator assistance. After successfully bidding for the project, MCI subcontracted with Gateway. Under their contract, MCI, as a telephone service carrier, agreed to secure the local access lines over which inmate calls would be made, while Gateway promised to furnish, install, and maintain all the equipment and technology necessary to provide the automated collect calls.[1] The contract expressly provided that the parties were independent contractors and neither partners, joint venturers, nor agents. Contract ("Agreement"), Apr. 29, 1991, at Article 2. Further, it imposed on the parties a duty to negotiate in good faith any disputes arising from the contract. *Id.* at Article 9. In the event that such good faith negotiations proved fruitless, the parties agreed to binding arbitration, "except that errors of law shall be subject to appeal." *Id.*

After installment of the VADOC phone system, MCI complained to Gateway that the automated system it had designed was improperly completing many collect calls. Ostensibly, because of the problems with Gateway's system, MCI integrated its own automated system to bypass the defective one. During the arbitration, however, the

_____

[1] An inmate, for example, would dial an authorized number and, when the recipient answered, a recorded message would announce the inmate's name and inform the recipient that he could accept charges for the call by pressing or dialing "3."

arbitrator found that MCI's decision to migrate from the Gateway system was motivated primarily by the significant profits promised by integration.[2]  Once MCI had integrated its own system, it sent a default notice to Gateway.  Although Gateway proposed to cure the defects with updated software, MCI refused to sign a confidentiality agreement for this software, thus leaving the problems with the original system unsolved.  In January 1993, MCI formally terminated its contract with Gateway.

On July 30, 1993, the arbitrator found that MCI had breached its contractual duty to negotiate in good faith and awarded actual as well as punitive damages to Gateway.  MCI filed a motion in the United States District Court for the Northern District of Texas to vacate the award;  Gateway simultaneously moved to confirm it.  Although the district court purported to review the award according to the standard agreed upon in the contract, it did not interpret "errors of law" as requiring "a scrutiny as strict as would be applied by an appellate court reviewing the actions of a trial court."  Rather, it chose to "review the [a]ward under the harmless error standard, but with due regard for the federal policy favoring arbitration."  Applying this standard, the district court confirmed the award in its entirety.

## II. DISCUSSION

A. Standard of Review

---

[2]During the arbitration, Gateway presented internal MCI memoranda that supported this conclusion.  One estimate suggested that MCI would earn a net revenue from savings of nearly $84,000 per month if it migrated from the Gateway system.

This court reviews the district court's confirmation of an arbitration award under a de novo standard. *Executone Info. Sys., Inc. v. Davis,* 26 F.3d 1314, 1320 (5th Cir.1994); *McIlroy v. PaineWebber, Inc.,* 989 F.2d 817, 819-20 (5th Cir.1993); *Forsythe Int'l, S.A. v. Gibbs Oil Co.,* 915 F.2d 1017, 1020-21 (5th Cir.1990). As the Supreme Court recently explained, this is not a special standard, but reflects the application of typical appellate principles. *First Options of Chicago, Inc. v. Kaplan,* --- U.S. ----, ---- - ----, 115 S.Ct. 1920, 1925-26, 131 L.Ed.2d 985 (1995).

Usually, however, the district court's "review of an arbitration award is extraordinarily narrow." *Antwine v. Prudential Bache Securities, Inc.,* 899 F.2d 410, 413 (5th Cir.1990). In a proceeding to confirm or vacate an arbitration award, the Federal Arbitration Act ("FAA") circumscribes the review of the court, providing that an award shall not be vacated unless: (1) the award was procured by corruption, fraud, or undue means; (2) there is evidence of partiality or corruption among the arbitrators; (3) the arbitrators were guilty of misconduct which prejudiced the rights of one of the parties; or (4) the arbitrators exceeded their powers. 9 U.S.C. § 10(a)(1)-(4) (Supp.1995). *Forsythe Int'l, S.A.,* 915 F.2d at 1020.

In this case, however, the parties contractually agreed to permit expanded review of the arbitration award by the federal courts. Specifically, their contract details that "[t]he arbitration decision shall be final and binding on both parties, except that *errors of law shall be subject to appeal.*" (emphasis

4

added).  Such a contractual modification is acceptable because, as the Supreme Court has emphasized, arbitration is a creature of contract and

> the FAA's pro-arbitration policy does not operate without regard to the wishes of the contracting parties....  "[I]t does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself.  *Indeed, such a result would be quite inimical to the FAA's purpose of ensuring that private agreements to arbitrate are enforced according to their terms.*  Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.  Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted.'  *Mastrobuono v. Shearson Lehman Hutton, Inc.,* --- U.S. ----, ----, 115 S.Ct. 1212, 1216, 131 L.Ed.2d 76 (1995) (*quoting Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 1256, 103 L.Ed.2d 488 (1989)) (emphasis added).

*See also Vimar Seguros y Reaseguros, S.A., v. M/V Sky Reefer,* --- U.S. ----, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (enforcing a contractual provision mandating arbitration in Tokyo, Japan); *First Options of Chicago v. Kaplan,* --- U.S. ----, ----, 115 S.Ct. 1920, 1925, 131 L.Ed.2d 985 (1995) (observing that "the basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, but to ensure that commercial arbitration agreements, like other contracts are enforced according to their terms.") (citations omitted); *Allied-Bruce Terminix Companies, Inc., v. Dobson,* --- U.S. ----, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (the FAA "intended courts to enforce arbitration agreements into which parties had entered and to place such agreements upon the same footing as other contracts.") (citations omitted);  *Shearson/American Express, Inc. v. McMahon,*

5

482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (stressing that courts should "rigorously enforce agreements to arbitrate."). Because these parties contractually agreed to expand judicial review, their contractual provision supplements the FAA's default standard of review and allows for de novo review of issues of law embodied in the arbitration award.[3]

The district court accordingly erred when it refused to review the "errors of law" de novo, opting instead to apply its specially crafted "harmless error standard." This choice apparently reflected the district court's unwillingness to enforce the parties' contract because "the parties have sacrificed the simplicity, informality, and expedition of arbitration on the altar of appellate review." Prudent or not, the contract expressly and unambiguously provides for review of "errors of law"; to interpret this phrase short of de novo review would render the language meaningless and would frustrate the mutual intent of the parties. When, as here, the parties agree contractually to subject an arbitration award to expanded judicial review, federal arbitration policy demands that the court conduct its review according to the terms of the arbitration contract. *See, e.g., Volt Info. Sciences, Inc.,* 489 U.S. at 469, 109 S.Ct. at 1250.

---

[3]Of course, the FAA would govern review of the arbitration had the contract been silent. However, the FAA does not prohibit parties who voluntarily agree to arbitration from providing contractually for more expansive judicial review of the award. "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Info. Sciences, Inc.,* 489 U.S. at 469, 109 S.Ct. at 1250.

Because the district court erroneously employed "harmless error" review of the award, both the actual and punitive damages awarded to Gateway were scrutinized and confirmed less rigorously than the parties had intended.  As a result, this court will review the award de novo for "errors of law."[4]

B. Actual Damages

Upon finding that MCI had breached its contractual obligation to negotiate in good faith with Gateway, the arbitrator awarded actual damages to Gateway in the form of attorneys' fees.[5]  The award is premised on the notion that had MCI satisfied its contractual obligation, Gateway would not have incurred significant litigation expenses;  in different terms, it was reasonably foreseeable that Gateway would incur attorneys' fees if MCI breached its duty to negotiate in good faith.  MCI objects to this award of actual damages as an "error of law" and urges that under the American Rule, a "litigant cannot collect attorneys' fees from the losing party unless a statute or contract provides for the

---

[4]MCI also contends that it was an "error of law" for the arbitrator to exclude from evidence an audio tape and a video tape purporting to demonstrate the failures of the Gateway system.  We disagree.  MCI makes no headway on this point because arbitrators' evidentiary decisions should be reviewed with unusual deference.  "Judicial review of arbitration awards is [so] tightly limited;  perhaps it ought not be called "review' at all."  *Baravati v. Josephthal, Lyon & Ross, Inc.,* 28 F.3d 704, 706 (7th Cir.1994) (Posner, J.).  Because the arbitrator could have easily found that the tapes were merely cumulative of testimony already before him, it was not an abuse of his discretion to exclude them from evidence. *Stokes v. Georgia-Pacific Corp.,* 894 F.2d 764, 767 (5th Cir.1990).

[5]Specifically, the arbitrator ordered MCI to pay $664,800 to Gateway for its attorneys' fees.  Award of Arbitrator, July 30, 1993.

7

award, or the losing party willfully disobeyed a court order or brought suit in bad faith." *See Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 259-60, 95 S.Ct. 1612, 1622-23, 44 L.Ed.2d 141 (1975). MCI contends further that since the exceptions to the American Rule do not apply in this case, the award of attorneys' fees should be vacated.

Unfortunately for MCI, its objections to the award of actual damages are not properly before this court because they were waived when MCI failed to object to the imposition of attorneys' fees at any time during the arbitration. Although Gateway argued to the arbitrator both in testimony and in written briefs that it was entitled to recover attorneys' fees as actual damages, MCI neither objected nor responded during the arbitration or in its post-hearing brief. Indeed, counsel for MCI admitted to this court in oral argument that MCI did not object to the award of attorneys' fees prior to the close of arbitration.

MCI's first objection was raised *after* arbitration when it sought to have the award vacated in district court. However, MCI "cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court." *Nat'l Wrecking Co. v. Int'l Brotherhood of Teamsters, Local 731,* 990 F.2d 957, 960 (7th Cir.1993). If a party were allowed to withhold objections until its appearance in federal court, this would extinguish any benefit of an arbitration contract as arbitrators would rarely, if ever, be fully apprised of the

issues before them.[6]  Accordingly, MCI has waived its objections to the imposition of attorneys' fees and the arbitrator's award of actual damages must be confirmed.

C. Punitive Damages

But the award of actual damages was coupled with a $2,000,000 award of punitive damages.  In an extremely confusing passage, the arbitrator found that the punitive damages were justified

> "in part for an *additional reason perhaps not assigned by Claimant, but found by the Arbitrator:*  that Respondent's attempt to terminate Claimant for default was part of a deceptive scheme in wanton disregard of Respondent's obligations to Claimant."[7]

Beyond this lone, opaque statement, the arbitration award is silent about its rationale for imposing punitive damages against MCI.

Notwithstanding the district court's reference to "federal law" as the rule of decision, any punitive damage award must be consistent with the substantive state law governing the arbitration.  The arbitrator, hearing the dispute in Richmond, Virginia, avowedly applied the substantive law of Virginia to this dispute.[8]  For instance, during the arbitration proceeding the

---

[6]*See also, United Food & Commercial Workers, Local 100A v. John Hofmeister & Son, Inc.,* 950 F.2d 1340, 1345 (7th Cir.1991) (recognizing that allowing parties to withhold their objections would "undermine the purpose of arbitration.").

[7]Award of Arbitrator, July 30, 1993 (emphasis added).  The suggestion that an arbitrator has the authority to decide a dispute that is not before him is meritless and is dispelled by the unambiguous language of the FAA.  *See, e.g.,* 9 U.S.C. § 10(a)(4) (Supp.1995) (arbitrator cannot exceed his contractual powers).

[8]Gateway admits that the arbitrator announced that he would apply Virginia law.  Although Gateway suggests that Virginia law did not govern every issue before the arbitrator, it finds no

9

arbitrator "announced, of course, earlier that I was going to apply Virginia law, if there was no choice of law in the [arbitration] clause...."[9] Additionally, the arbitrator speculated that Virginia courts might have jurisdiction to review the award, suggesting strongly that Virginia law governed the arbitrator's resolution of the dispute.[10]

If Virginia law allowed the arbitrator to impose punitive damages and if the arbitration contract did not expressly prevent the arbitrator from doing so, then such an award would have fallen under the arbitrator's broad discretion to decide damages and fashion remedial relief. *Executone Info. Sys., Inc. v. Davis,* 26 F.3d 1314, 1324-25 (5th Cir.1994) (an arbitration award is legitimate so long as it draws its essence from the contract). Other federal courts addressing the issue generally concur. *See, e.g., Baravati v. Josephthal, Lyon & Ross, Inc.,* 28 F.3d 704 (7th Cir.1994) (award of punitive damages for defamation did not exceed arbitrator's authority); *Lee v. Chica,* 983 F.2d 883 (8th Cir.1993) (arbitrator could award punitive damages for fraud and breach of fiduciary duty), *cert. denied,* --- U.S. ----, 114 S.Ct. 287, 126 L.Ed.2d 237 (1993); *Todd Shipyards Corp. v. Cunard Line, Ltd.,* 943

---

support in the record for this suggestion.

[9]The arbitration clause did not contain a choice of law provision.

[10]When considering an evidentiary matter, the arbitrator said, "To protect [the attorney] from the wrath of the *Virginia Supreme Court,* if this goes up on appeal or what have you, that [sic] let's try to find some other way to get this letter in." (emphasis added).

F.2d 1056 (9th Cir.1991) (upholding an award of punitive damages and attorneys' fees for bad faith); *Raytheon Co. v. Automated Business Sys., Inc.,* 882 F.2d 6 (1st Cir.1989) (tort claims allowed for punitive damages); *Bonar v. Dean Witter Reynolds, Inc.,* 835 F.2d 1378, 1386-87 (11th Cir.1988) (language of arbitration contract did not prevent arbitrator from awarding punitive damages). Moreover, the Supreme Court has just confirmed that arbitrators presumptively enjoy the power to award punitive damages unless, unlike this case, the arbitration contract unequivocally excludes punitive damages claims. *Mastrobuono,* --- U.S. at ----, 115 S.Ct. at 1216-17.

Although the arbitrator in this case wielded the power to impose punitive damages, his rationale for doing so must be consistent with Virginia law. Under Virginia law, punitive damages cannot be imposed merely for breach of contract.[11] In different terms, punitive damages must be predicated on tort liability. *Gasque v. Mooers Motor Car Co., Inc.,* 227 Va. 154, 159, 313 S.E.2d 384, 388 (1984) (holding that "[p]unitive damages are unavailable in suits purely *ex contractu,* and can be awarded only where an independent, willful tort is alleged and proved."); *Kamlar Corp. v. Haley,* 224 Va. 699, 707, 299 S.E.2d 514, 518 (1983) (mere breach of contract, unaccompanied by willful tort, cannot sustain punitive damage award). Virginia law also requires that an award of punitive damages be supported by an award of compensatory tort

---

[11]Gateway does not dispute that, under either Virginia or Texas law, punitive damages cannot be awarded merely for breach of contract.

11

damages. *See, e.g., Murray v. Hadid,* 238 Va. 722, 732, 385 S.E.2d 898, 905 (1989); *A & E Supply Co., Inc., v. Nationwide Mutual Fire Ins. Co.,* 798 F.2d 669, 673 (4th Cir.1986). Quite simply, if MCI is not liable to Gateway for tort damages, then the arbitrator cannot impose punitive damages.

Whether the arbitrator found MCI liable to Gateway for tort damages is vigorously contested. In fact, MCI contends that Gateway never timely alleged tortious conduct or requested punitive damages during the arbitration. Both MCI and Gateway agree that five days before arbitration, Gateway sent to the American Arbitration Association ("AAA") a letter enclosing two additional briefs in which Gateway alleged a breach of fiduciary duty by MCI and discussed the "Law Relating to Punitive Damages."[12] On the same day, MCI filed a written objection to the briefs as untimely. MCI requested that the AAA not forward these briefs to the arbitrator, while Gateway suggested that they be forwarded with or without response by MCI. The AAA sustained MCI's objection to the briefs

---

[12]Rule 8 of the AAA's Commercial Arbitration Rules provides that,

> After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA, and a copy shall be mailed to the other party, who *shall have a period of ten days* from the date of such mailing within which to file and answer with the AAA. After the Arbitrator is appointed, however, *no new or different claim may be submitted except with the Arbitrator's consent.* (emphasis added).

Although the briefs were submitted after the cutoff date in Rule 8, the arbitrator retains discretion under the Rule to admit untimely claims.

as untimely, but instructed Gateway that it could seek leave from the arbitrator to file the briefs.  Pursuant to this instruction, Gateway presented the briefs to the arbitrator on the first day of hearings.  The arbitrator accepted the additional briefs, and MCI renewed its objection to them as untimely.

While the record demonstrates that the arbitrator allowed Gateway to submit its claim, albeit untimely, for breach of fiduciary duty, there is heated debate over whether Gateway subsequently disclaimed its tort theories, choosing to rely exclusively on contractual bases for recovery.  MCI insists that Gateway repeatedly disclaimed any tort claim against MCI.  This argument enjoys support in the record.  For example, in a prehearing submission to the arbitrator, Gateway suggested that "the *only issues before the Arbitrator* are, first, whether Gateway properly cured ... defaults in Gateway's performance, and second, whether MCI breached the Agreement by unlawfully terminating it and failing to negotiate in good faith."  These issues were reiterated during Gateway's opening statement as the "two fundamental questions" confronting the arbitrator.  Additionally, Gateway's President, Richard Cree, testified during the arbitration that the company alleged neither conspiracy nor fraud.  In closing arguments, Gateway urged that

> In determining whether MCI breached their contractual duty to negotiate in good faith, it is not necessary that you find that they proceeded in bad faith. *This is not a tort, we are alleging.*  All that is necessary is that you find that they failed to carry their affirmative contractual obligation to negotiate in good faith.

While the record demonstrates that throughout the arbitration,

13

Gateway relied primarily on its claims for breach of contract, this court is unable to find that Gateway conclusively waived its claim for breach of fiduciary duty. Given Gateway's representations to the arbitrator, this decision is a close one. However, since Gateway never expressly waived the claims for breach of fiduciary duty made in the brief presented to the arbitrator and accepted by him, this court is unwilling to hold that these claims were waived by Gateway's more general denials of fraud and conspiracy.

But even if Gateway did not actually waive its claim for breach of fiduciary duty, the punitive damage award issued by the arbitrator must be vacated because, as a matter of law, the facts do not sustain a claim for breach of fiduciary duty.[13] Initially, there is no formal relationship between MCI and Gateway that would impose fiduciary duties on MCI since their contract expressly provides that "[e]ach party shall act as an independent contractor *and not as agent for, partner of, or joint venturer* with the other party. The parties *create no other relationship* outside of that contemplated by the terms of this Subcontract." Agreement, Apr. 29, 1991, at Article 2. Also, Gateway did not share in either profits or losses under the contract, but received instead a fixed percentage of gross collected revenues. *Id.* at Article 6. The Agreement did not create a partnership capital account and provided

_____

[13]While this court applies the substantive law of Virginia to the claims before the arbitrator, Gateway concedes that there are no material differences between Texas and Virginia law on fiduciary duty. Brief of Appellee, at 27 n. 85. *See also, Crim Truck & Tractor v. Navistar Int'l Trans. Corp.,* 823 S.W.2d 591, 594 (Tex.1992) (whether a relationship gives rise to fiduciary duties is a question of fact).

14

for no joint ownership of property or for the filing of partnership tax returns. *Id.* at Article 15. The language of the contract is unambiguous and establishes that the parties intended no formal relationship which would impose fiduciary duties on MCI.

Because there is no formal fiduciary relationship between the parties, Gateway attempts to establish an "informal" fiduciary relationship.[14] Under Virginia law, the existence of such a fiduciary relationship is a question of fact. *Allen Realty Corp. v. Holbert,* 227 Va. 441, 446-47, 318 S.E.2d 592, 595 (1984). A fiduciary relationship may arise " "when *special confidence* has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence.' " *Allen Realty Corp.,* 227 Va. 441, at 446, 318 S.E.2d 592 (*quoting H-B Partnership v. Wimmer,* 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979)); *Myers v. Finkle,* 950 F.2d 165, 168 (4th Cir.1991).

But no genuine issue of material fact demonstrates that the relationship between MCI and Gateway was one of special confidence. Instead, Gateway admits that it was "nominally the subcontractor in the ensuing contract with VADOC," and that it understood that MCI was "a *competitor of Gateway* even before the [contract] was signed...." Given their history as competitors as well as the

---

[14]In its brief, Gateway suggests that "[a] fiduciary duty may arise either as a result of a formal relationship, such as a partnership or joint venture, or through an informal relationship...." Since their contract expressly disclaims the formal relationship, Gateway's argument rests on the strange notion that a standard subcontracting agreement somehow burdened MCI with fiduciary duties.

15

language of the contract disclaiming any present fiduciary relationship, the argument that Gateway and MCI had a special, informal relationship of repose and trust that imposed fiduciary duties on MCI is untenable.

Further, neither Gateway's observation that MCI enjoyed "vastly superior financial resources" nor that "Gateway was entirely dependent upon MCI to represent Gateway fairly and honestly in MCI's communications with VADOC" transforms the relationship from contractual to fiduciary.[15] Of course, financial disparity between parties is not sufficient to make them fiduciaries. Also, the record belies Gateway's complete dependence on MCI and establishes that, although MCI was the prime contractor with VADOC, Gateway operated as an independent subcontractor.[16] For example, Gateway had access to the Virginia prisons to operate and maintain its equipment and software. Additionally, if necessary, Gateway could communicate directly with VADOC. Properly understood, Gateway's agreement with MCI was nothing more than a standard subcontract that imposed contractual obligations on both parties but which did not create either a formal or an informal fiduciary relationship.

There is no support under Virginia law for holding that MCI

---

[15]Gateway's ill-conceived notion of fiduciaries would impose fiduciary duties on virtually all subcontracting relationships since the resources of the parties as well as their rights and obligations under these contracts usually vary.

[16]See, e.g., Agreement, Apr. 29, 1991, at Article 2 (independent contractor status) & Article 5 (Gateway's responsibilities).

and Gateway were fiduciaries.  As a result, the arbitrator's award of punitive damages is not supported by an independent tort and is contrary to Virginia law.

## III. CONCLUSION

For the reasons provided, this court VACATES the award of punitive damages and otherwise AFFIRMS the arbitration award.

17