DECISION
This matter is before the Court on the plaintiff's motion to modify or vacate an arbitration award, pursuant to G.L. 1956(1997 Reenactment) § 10-3-12 (4), and the defendant's motion to confirm the award pursuant to § 10-3-11. The plaintiff ("Bradford") operates a textile manufacturing facility involving the dyeing and finishing of woven cloth fabrics. On April 15, 1993, the plaintiff agreed, by an Amended and Restated Purchase Agreement (Plaintiff's Exhibit B 61) ("the agreement"), to purchase five Aqualife regenerator units, together with the services necessary for the engineering, manufacture, installation and start-up of the regenerator units and associated equipment, from the defendant ("Stog") for $1,050,000, of which under a prior agreement the plaintiff had already paid, as a deposit, the sum of $375,000. The parties agreed in paragraph 12 of their agreement that any controversy or claim arising out of the agreement would be settled by arbitration. The arbitrator was required to apply the substantive law of Rhode Island. Either party is permitted by the arbitration agreement to appeal any conclusion of law in the arbitration decision to a court of competent jurisdiction. Findings of fact by the arbitrator are deemed to be "absolute."
On July 13, 1994, Bradford formally notified Stog that it was terminating the agreement. Bradford alleged that it had concluded that Stog would not be able to perform its obligations under the agreement. In addition, Bradford said that it had concluded that the installation and operation of the Aqualife equipment would not result in its waste water discharge meeting the effluent limitations as required under its discharge permit as issued by the Department of Environmental Management (DEM). Bradford claimed that under paragraph 6 of the agreement it was entitled to terminate the agreement. The matter was submitted to arbitration in May 1996. On June 29, 1998, the arbitrator concluded that Bradford had breached the agreement without any appropriate basis. He awarded Stog damages in the amount of $1,008,851, including interest since September 1, 1993, and certain storage charges. Bradford was also ordered, as part of the award, to reimburse Stog for its share of the arbitration costs. Stog was also awarded its counsel fees of $162,000 in a supplemental award in September 1998.
Bradford principally argues that, as a matter of law, its obligation to pay for the equipment and services was subject to the obtaining of approval of Stog's system by DEM, which approval was never forthcoming. Stog argues that the agreement could not be terminated by Bradford, as provided in the pertinent portions of paragraph 6 of the agreement, unless Stog failed to perform any of its obligations under the agreement, or failed to substantially initiate the services, or failed to make progress so as to give Bradford reason to anticipate that such failure to make progress may endanger Stog's performance of the agreement, and that Stog had forty-five days after notice to cure any such failure. Stog further contends that it was Bradford's responsibility to obtain DEM approval, and that the failure to obtain that approval did not relieve Bradford of the obligation to pay Stog for the equipment and service described in the agreement.
The arbitrator's findings are mixtures of rulings or conclusions of law and findings of fact based on evidence. Sometimes a single sentence will contain both fact-finding and legal conclusions. The arbitrator's patent failure to know and recognize the difference compounds the difficulty of the review permitted by the agreement.
The arbitrator concluded as a matter of fact that the evidence presented to him did not support Bradford's claim that it was entitled to terminate the agreement. He observed that paragraph 6 of the agreement contained certain specific and limited grounds for termination. None of them applied so far as he could find. He specifically found that Bradford had not shown that Stog had failed to perform any of its obligations under its agreement and that the evidence did not support any conclusion that it would not if allowed to proceed. That determination is the kind of resolution peculiarly appropriate for arbitration, especially arbitration by a qualified expert in the appropriate field.
This Court is not permitted, either by the express terms of the arbitration agreement nor by well-established law, to review the purely fact-finding functions of the arbitrator. The Court is satisfied that the arbitrator was well within the exercise of his fact-finding powers when he found, as a matter of fact, that the evidence did not support the factual conclusion that, when Bradford gave notice of its intention to terminate the agreement, none of the grounds of termination under paragraph 6 existed. This satisfaction is enhanced for this Court by virtue of the fact that this arbitrator was, himself, especially qualified in the field of waste water treatment. Even if the arbitrator was arguably wrong on the purely factual issue as to whether or not Stog's system, if installed, would perform as required by the agreement, this Court could not substitute its judgment for his.
Ordinarily, this Court, also, will not review arbitration awards for mistakes of law which do not amount to manifest disregard of the law. Westminster Construction Corporation vs.PPG Industries, Inc., 119 R.I. 205, 210, 376 A.2d 708, 711 (1977). In this case, however, the parties have expressly limited their agreement to submit disputes to arbitration by providing for judicial review of conclusions of law. This Court finds guidance in Gateway Technologies vs. MCI Telecommunications,64 F.3d 993, 997 (5th Cir. 1995), so that this Court will review the award for errors of law and appropriately remedy any such errors in this proceeding.
The plaintiff challenges a number of findings and conclusions of the arbitrator as errors of law.
In paragraph 10 of his findings, headed as Conclusions ofLaw, the arbitrator said:
 "10. Nowhere in the Amended Purchase Agreement is there any condition precedent that an Order of Approval be obtained from RIDEM to install the Aqualife System prior to Bradford being obligated to pay the purchase price to Stog. It would have been rather simple for the drafter of the Agreement to state expressly that Bradford would be under no obligation to pay the purchase price to Stog unless and until an Order of Approval to install the Aqualife System had been obtained from RIDEM. No such condition precedent exists in the Amended Purchase Agreement."
The evidentiary observation of the lack of such an express
condition of Bradford's obligation to pay is literally correct. It is the legal conclusion that, as a result, the failure to obtain such approval is altogether immaterial to Bradford's obligation to pay, which is challenged by the plaintiff as an error of law.
In paragraphs 16, 17 and 20, under the heading Findings ofFact, the arbitrator said:
 "16. The Amended Purchase Agreement is not conditioned upon Bradford's successful completion of sludge removal or the issuance by RIDEM of an Order of Approval. These were Bradford's obligations, and Bradford ultimately failed to perform them.
 17. At all pertinent times, it was Bradford which undertook the responsibility to obtain an Order of Approval from RIDEM. Bradford made all applications through its attorneys; Bradford directed and conducted all negotiations with RIDEM; and Bradford completely controlled the application process and all interface with RIDEM in order to obtain the Order of Approval for installation of the Aqualife System. Even more importantly, Bradford admitted at the hearing that it was its responsibility and obligation to obtain the RIDEM Order of Approval to install the Aqualife System, because it was the owner, and the owner, "as a matter of law," had the responsibility to obtain all RIDEM Orders of Approval and permits. To the extent that Bradford made an argument that there is any ambiguity in the Amended Purchase Agreement with respect to who had the obligation to obtain the RIDEM Order of Approval to install the Aqualife System, it is clear that the parties intended that responsibility to be Bradford's, that Bradford actually undertook that responsibility, and that Bradford had that responsibility as a matter of law.
 * * *
 20. I find that the parties did not intend that Stog be obligated to obtain the RIDEM Order of Approval to install the Aqualife System as a condition precedent for being paid. I find that the parties intended that the issuance of an Order of Approval was a precondition for the delivery, installation and payment for the Aqualife System in the Amended and Restated Purchase Agreement. It would have been impossible for Stog to have obtained the Order of Approval since Stog was not the owner. It is clear in Section 11 (a) of the Amended Purchase Agreement that the types of state and local licenses, permits, and authorizations envisioned therein to be obtained by Stog would be such state and local permits such as electrical permits, building permits, etc."
Paragraph 16 is plainly a conclusion of law, except for the last clause of the second sentence. Whether or not the agreement was conditioned on the issuance by DEM of an Order of Approval is plainly a question of law. The defendant appears to agree. SeeMemorandum of Law of J. Stog Tec Gmbh. c., p. 34 ("It was Bradford's obligation to obtain the Order of Approval from RIDEM. It's failure to do so, for whatever reason, as a matter of factand law cannot constitute grounds for Bradford's being excused from performing under the agreement.") Whose obligation it was to obtain that approval and what difference, if any, it made are also primarily mixed questions of fact and law, as the defendant has also recognized. See Memorandum of Law of J. Stog Tec, Gmbh.,
p. 35. The last sentence of paragraph 20 is a conclusion of law, because Section 11 of the agreement is anything but clear.
A Consent Agreement between Bradford and DEM, concluded on January 4, 1993, was attached to and incorporated into the agreement between Bradford and Stog. It is clear, as a matter of law, that paragraphs 9, 11, 12 and 13 of the Consent Agreement fully implicate DEM's approval at every step of the implementation of the Aqualife Treatment System as described to DEM in the November 26, 1991 original application by Bradford for approval of the system. Paragraph 11 requires Bradford to submit a plan to evaluate the ability of the system to meet all the limitations imposed by a pollutant discharge elimination system permit (RIPDES permit number RI 0000043) issued on October 11, 1991. Paragraph 12 provides that upon Bradford's satisfying a sludge removal requirement and the submission of the plan required by paragraph 11, DEM would issue an Order of Approval for the installation and operation of the Aqualife System as a demonstration project for 18 months. Paragraph 13 provides that within 12 months of the installation of the system, DEM will either approve the system as a permanent system or enter into an agreement with Bradford requiring modification or removal of the system as appropriate. That DEM approval of the system was critical at every stage from design through one year of operation, is inescapable.
Section 2.b. of the agreement provides: "Subject to furtherD.E.M. orders, supplier [Stog] shall perform the services described in Exhibit A-2 so as to meet the delivery and installation schedule for the equipment set forth in the ConsentAgreement." (Emphasis supplied). In Section 2.c. Stog agreed to "cooperate fully with the system testing to be conducted by [Bradford] and/or its representatives pursuant to paragraphs 11aand 13 of the Consent Agreement." (Emphasis supplied). Section 5.6 contains a detailed warranty that the system will reduce certain pollutants in Bradford's waste water to levels permitted by the pertinent pollutant discharge elimination system permit.
It is undisputed that DEM never issued the Order of Approval referred to in the first sentence of the Consent Agreement, as incorporated in the agreement. The conclusion by the arbitrator in paragraph 20 of the award that DEM approval of the system was a precondition to the agreement is no typographical error or inadvertent misstatement. It is no more than a reflection of the obvious.
The arbitrator found, however, purportedly as a fact, that Bradford was responsible for obtaining the Order of Approval. Although he concluded, as a matter of law, that only Bradford, as "owner" of the proposed system, could obtain the Order of Approval, he never found that Bradford's failure to obtain the approval was due to any fault on Bradford's part. In order for the project to go forward, the Order of Approval had to be obtained by someone, either Bradford or Stog. It is also obvious that neither party could get the approval without the help of the other. Bradford was not, and could not have been found by the arbitrator to be qualified in the design, manufacture, installation, operation and testing of a waste water system. of course, Stog, who was so qualified, was in no position to obtain a permit without the active participation of Bradford, the party to the Consent Agreement with DEM. While, of course, procedurally only Bradford had "standing" to seek DEM approval, substantively that approval depended on Stog's being able to satisfy DEM that the system could do what it was designed to do.
The legal issue in this case is not who was responsible for obtaining the approval, as perceived by the arbitrator, but rather who was responsible for the failure of DEM to issue its approval. The arbitrator clearly perceived that DEM's approval was a necessary precondition to the project going forward. He recognized that both parties were aware of that necessary condition when he found, "I find that the parties intended that the issuance of an Order of Approval was a precondition for thedelivery, installation and payment for the Aqualife System in the Amended and Restated Purchase Agreement."
The arbitrator, however, erroneously equated responsibility with blame. Since Bradford was responsible for obtaining the Order, according to the arbitrator, he is to blame for DEM's failure to issue the Order. In paragraphs 22 through 24 of his award, the arbitrator did find that Edwin Barnhart, engaged by Bradford to assist with its sludge removal problem, referred to in paragraph 10 of the Consent Agreement, made a negative assessment of the Aqualife System and had persuaded Bradford to abandon any reliance on the Aqualife System. The arbitrator noted a letter of April 18, 1994 from Mr. Barnhart to DEM on behalf of Bradford requesting a modification to the Consent Agreement which would preclude the use of the Aqualife System. In fact, paragraph 13 of a Supplemental Consent Agreement, issued pursuant to the April 18, 1994 letter, left open to Bradford whether to proceed with the Aqualife System, as proposed, or to propose modifications to the system. The arbitrator never concluded on the basis of this communication, that Bradford induced DEM not to issue its approval of the Aqualife System. While, of course, the arbitrator was fully competent to disregard all of Mr. Barnhart's opinions as utterly worthless and not a proper basis upon which to terminate the agreement, he is not competent, in the absence of evidence, to assign fault to Bradford for DEM's decision.
It is hard to fault the arbitrator for his well-founded desire to remedy a faulty engineering assessment, as he was qualified to find it, from Edwin Barnhart, on which it appeared Bradford was relying to terminate its agreement with Stog. What he, in his turn, missed was the significance of DEM's failure to issue the necessary Order of Approval, without which the agreement became useless, based perhaps on Stog's failure to overcome DEM's doubts. Given the failure of the express condition precedent to Bradford's performance without fault on Bradford's part, the law excuses Bradford from performance. Restatement ofContracts, 2d. Ed., §§ 225 and 261 (1981). Both Bradford and Stog were fully aware of the omnipresence of DEM looming over every aspect of the agreement. Stog plainly accepted the risk of DEM's refusal to approve its system on its engineering merits. Stog understood that without DEM's approval, over which neither it nor Bradford had any control, Bradford simply could not use the Aqualife system nor could it be expected to pay for it.
The pertinent rule of law which sets forth the consequences of a blameless and unforeseen failure of an implied condition in a contract is best expressed in 17A C.J.S. 613-14, Contracts
§ 463.1 c.:
 "There may be, in the nature of the contract, an implied condition by which the promisor may be relieved from his unqualified obligation to perform, and performance may be excused when rendered impossible without his fault. Such is the case where it appears from the contract that the parties knew and contemplated that its fulfillment would be dependent on the existence, at the time for performance, of certain things or conditions essential to its execution, or where performance depends on the happening of an event over which neither party has any control, in which case a condition may be implied that the contract shall be abrogated on the nonhappening of the event." (Footnotes omitted).
The arbitrator's attempt to unlink Bradford's obligation to pay for the system from the regulatory approval of the system is utterly irrational. It is true that the agreement does not expressly make DEM approval a condition of Bradford's obligation to pay for the system. It didn't need to as a matter of law. There is no question but that Bradford was not permitted, as a matter of law, to install the system without such approval. The arbitrator's conclusion that Bradford must pay for a system it could not use not only defies rationality, it commands performance of a patently unconscionable agreement. How, in good conscience, can Bradford be compelled to carry out an executory contract to pay for goods and services, which all agree would be useless to it?
The legal problem is one of allocation of risk where the contract is silent. The approval of DEM was essential to the agreement. In the absence of such approval the equipment and services, for which Bradford agreed to pay, became worthless, so much useless junk, to Bradford. Without DEM approval, Bradford's purpose for entering into a contract with Stog became utterly frustrated.
The critical operational facts are not disputed. Stog agreed to sell certain goods and to provide certain services. Bradford agreed to pay a price for the goods and services. The contract is silent as to what will happen, if, due to circumstances beyond the control of either party, DEM refuses, justified or unjustified, to approve the system, as sold by Stog and bought by Bradford.
There are only two alternatives. It is a matter of law to decide which applies. First, the contract may be enforced literally, and Bradford is assigned the risk of loss. It must pay for worthless goods or services. Second, the contract may be deemed discharged by failure of a condition precedent or for impossibility of performance, and Stog is assigned the risk of loss. In the latter event, however, the law does not force a promisee to forfeit whatever reasonable cost it has reasonably expended to prepare for its performance, since the application of the doctrine is required to achieve a just result. It would be unjust to deprive Stog of its out-of-pocket good faith investment in the project.
Finally, in that regard there remains a consideration of the $375,000 advanced by Bradford to Stog as a deposit on the execution of an earlier contract on September 6, 1991. The parties agreed that that amount would be received as an installment payment on the agreement. Bradford claims it is entitled to a return of that deposit because the agreement was terminated without fault on its part.
The proper disposition of the $375,000 would require the reopening of the 1991 agreement and the conduct of the parties between the execution of that agreement and the execution of the agreement which was the subject of the arbitration and this appeal. It is notable in this respect that during that period, according to the arbitrator, Stog sold one of the regenerator units in July 1992. There is no way to tell from the findings of the arbitrator whether or not Stog had earned at least $375,000 before April 15, 1993, the date of the Restated and Amended Agreement. In addition, although the arbitrator assessed Bradford the full price of the five regenerator units it bought at $210,000 apiece, he did not afford Bradford any credit for the regenerator unit Stog sold in 1992 to Israel. There is no evidence that in fact Stog ever built a fifth unit under the agreement.
Under the circumstances, this Court cannot conclude that the arbitrator erred as a matter of law in failing to award Bradford reimbursement from Stog of $375,000 paid as a deposit under the 1991 agreement. Stog will be permitted to retain the deposit as well as the compensation it received for the fifth unit to prevent a forfeiture of Stog's out-of-pocket investment. Stog will, of course, lose its anticipated gains from the abrogated transaction.
For the foregoing reasons the arbitration award will be vacated. A final judgment will be entered in favor of the plaintiff on the defendant's claim in arbitration. A final judgment will be entered in favor of the defendant on the plaintiff's counterclaim in arbitration.