NEW ENGLAND UTILITIES, Plaintiff,

v.

HYDRO–QUEBEC, Defendant.

Civil Action No. 97–12545–PBS.

United States District Court,
D. Massachusetts.

June 15, 1998.

54

David H. Erichsen, Hale & Dorr, Boston, MA, for Plaintiff.

Damian R. LaPlaca, H. Glenn Alberich, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This case concerns an arbitration of a pricing dispute between New England Utilities ("NEU"), which is a group of American power companies, and Hydro–Quebec, a Canadian power company from which NEU purchases power. The parties disagree over whether two different "costs" should be included in the complex pricing formula in their long-term so-called Firm Energy Contract (the "Contract"). The dispute was aired at a three-week arbitration hearing in Boston before George A. Avery of the American Arbitration Association ("AAA"), who on October 10, 1997 adopted NEU's interpretation of its payment requirements to Hydro–Quebec.

Within days of the arbitrator's decision, NEU filed an action in Massachusetts Superior Court seeking to confirm the award under the Massachusetts Uniform Arbitration Act. Mass.G.L. c. 251, § 11. Hydro–Quebec filed a timely notice of removal to federal court based on diversity jurisdiction. 28 U.S.C. §§ 1332, 1441(a) & 1446(b). Hydro–Quebec then moved to vacate the Arbitrator's decision based on two "errors of law," which, Hydro–Quebec argues, are reviewable by this Court pursuant to the arbitration clause of the Contract. NEU responds (1) that Hydro–Quebec's motion to vacate was untimely under Massachusetts arbitration law; (2) that the Court's review should be limited to state or federal statutory standards less rigorous than "error of law"; and (3) that, in any event, the Arbitrator committed no legal error.

After hearing, the Court concludes that the motion to vacate is timely and that judicial review for arbitral errors of law is appropriate under the parties' agreement, but that the Arbitrator did not commit legal error in

excluding the two costs. Therefore, the Court **ALLOWS** NEU's Motion to Confirm and **DENIES** Hydro–Quebec's Motion to Vacate the Decision of the Arbitrator.

## BACKGROUND

The factual background recited here is based exclusively on the factual findings of the Arbitrator in his October 10, 1997 decision and on the Contract between the parties, dated October 14, 1985.

NEU is an unincorporated group of public and private utilities, each member of which is a participant in the New England Power Pool ("NEPOOL"), a common physically interconnected electric generation and transmission system for the New England region.[1] (Arb'r Dec. at 1.) Twenty companies and plants are listed in the Contract as members of NEU, including large regional companies, such as New England Power Company and The Connecticut Light and Power Company, and others which are far smaller. (Contract Supp. III.) A NEPOOL Management Committee, made up of executives of some of the participating utility companies, acts on behalf of all member companies of NEU.

Hydro–Quebec, a Crown corporation of Quebec, Canada, is headquartered in Montreal.

### A. The Firm Energy Contract

The contractual arrangement that is the centerpiece of this dispute arose out of the recognition by some of the NEPOOL Participants in the 1970s that they were relying too heavily for their energy needs on fossil fuel, principally oil and coal, at a time when the future supply of fossil fuel was potentially unreliable and expensive. Across the northern border was Hydro–Quebec, a "major vertically integrated utility" with vast power generation capabilities relying not on fossil fuel but rather, as the name suggests, on

hydro-electric power from sources in the northern part of the province of Quebec. (Arb'r Dec. at 18.) Sensing a compatible relationship, NEU and Hydro–Quebec agreed to physically interconnect their systems and arrange the delivery of power from Quebec to New England. (*Id.* at 18–19.)

The parties initially entered into an "Energy Contract" (not implicated in this case) which "provided for [Hydro–Quebec] energy sales to NEPOOL on an as-available basis." (*Id.* at 20.) The subsequent "Firm Energy Contract," the Contract under which this dispute arises, was signed on October 14, 1985 and is effective through August 31, 2004, at the latest. (Contract Art. 21.0.) NEU agreed to pay for a fixed annual quantity of energy from 1985 until August 31, 2000, and Hydro–Quebec agreed to make that fixed amount available across an agreed-upon "Interconnection" on the international border. (Contract Art. 2.1.) The fixed annual quantity is seven terawatt-hours of energy, or seven million megawatt-hours (MWh). (*Id.*)

The Contract's pricing structure is complicated. The price is a rate, measured in United States Dollars per megawatt-hour of energy ($/MWh). The rate is based on a "reference price," which was initially set by the Contract at $32.25/MWh.[2] The "price applicable for each megawatthour of Contract Energy delivered" is calculated by multiplying the reference price times the ratio of (i) certain of NEPOOL's *current* fossil fuel costs to (ii) the same fossil fuel costs as they were in 1983. The historical 1983 "cost," the denominator of the ratio, was fixed by the Contract at the rate of $40.33/MWh. In other words, any variation in the rate paid by NEU to Hydro–Quebec depends exclusively on the costs NEU incurs each year for its traditional source of electricity, fossil fuel.

The use of NEU's fossil fuel costs, seemingly unrelated to the deal, as a price gauge

---

1. By agreement of the parties, the "NEPOOL Participants" are defined as "the participants from time to time in NEPOOL under the New England Power Pool Agreement dated September 1st, 1971, as amended and as filed with the Federal Energy Regulatory Commission." (Contract Art. 1.20.)

2. After August 31, 1995, the reference price was set by contract at a higher rate for subsequent time periods. The reference price was set at $38.25/MWh for the period August 31, 1995 until August 31, 2000 and at $39.00/MWh for the period August 31, 2000 until August 31, 2004. Certain conditions not relevant to this case could change the periods corresponding to each reference price. (Contract Art. 6.1.)

was mutually beneficial to the parties. As the Arbitrator found, "[u]se of this approach met NEPOOL's goal of reducing the output of its fossil-fired plants and [Hydro–Quebec's] goal of creating an attractive market for its hydro-generated surplus based, not on the low production cost of hydro-generation, but on the higher production cost of the fossil-fired facilities it would supplant." (Arb'r Dec. at 19.) Said another way, for every nickel NEU saved on costs devoted to fossil fuel, it received a marginally lower rate on energy purchased from Hydro–Quebec. Hydro–Quebec, on the other hand, would presumably see an increase in volume sold to NEU of its hydro-electric power as NEU attempted to reduce its fossil fuel reliance.

The variable current fossil fuel cost figure in the Contract Energy price ratio is at the heart of this controversy between the parties. The cost figure, referred to in the Contract as the Annual Weighted NEPOOL Fossil Energy Cost ("AWNFEC"), is derived from another formula found in Supplement I of the Contract. (A copy of Supplement I is attached to this opinion as Appendix A.) The AWNFEC is "based on the actual experience of the NEPOOL Participants during the twelve-month period starting September 1st and ending August 31st." (Contract Supp. I.) It is a ratio of absolute cost (in U.S. Dollars) to energy (in MWh). Specifically, the AWNFEC

> shall be the quotient obtained from dividing
>
> 1) the *total cost of the Fossil Fuel burned* by NEPOOL Participants for the production of electrical energy during such twelve-month period, by
>
> 2) the total net electric energy generated from Fossil Fuel by the NEPOOL Participants during such twelve-month period.

(Contract Supp. I (emphasis added).) Supplement I of the Contract devotes several pages of text to the derivation of the numerator of the formula.[3] Several clauses are particularly relevant. First, the Supplement reads: "The *cost of the Fossil Fuel burned* by each NEPOOL Participant in any applicable twelve-month period shall be summed to

yield the *total* for NEPOOL for such period." Almost immediately below that sentence, the Supplement continues: "The *total cost of the Fossil Fuel burned* will be made up of the following four components." · After that introduction, four "Items" of cost are detailed under the following headings: "Fossil Fuel Cost Delivered"; "Fuel Additive Cost"; "Fossil Fuel Unloading Cost"; and "Fossil Fuel Handling Cost."

The 50-page Contract also contains a broad arbitration clause: "Any dispute between the parties with respect to this Contract shall not be submitted to any court, but shall instead be submitted to arbitration upon request of any party ...." (Contract Art. 22.0.) The parties agreed that any arbitration "shall be conducted in accordance with the Commercial Arbitration Rules, as supplemented by the Supplementary Procedures for International Commercial Arbitration, of the American Arbitration Association (AAA)." Finally, the Arbitration Clause contains this critical language:

> The arbitration proceeding shall be *conducted in Boston, Massachusetts* or such other places as may be agreed to by the ·parties. In construing this Contract, the Arbitrator shall apply the *laws of Quebec.* The Arbitrator shall have no power to amend or add to this Contract. Subject to such limitation, the decision of the Arbitrator shall be final and binding on all parties except that any party may petition a court of competent jurisdiction for *review of errors of law.*

(*Id.* (emphasis added).) In addition to the reference to Quebec law in the arbitration clause, the Contract contains a general choice of law provision indicating that the "Contract shall be governed by and construed in accordance with the laws of Quebec." (Contract Art. 16.0.)

### B. *Arbitration*

The record contains little or no information on the performance of this Contract prior to several years ago. In 1996, both parties demanded arbitration of disputes over pricing of energy sold by Hydro–Quebec to

---

**3.** The Contract is written in dual-column format. The left column contains the Contract in French, the right in English. Supplement I is four pages long, i.e., effectively two pages in each language.

NEU. First, on July 11, 1996, NEU filed with the AAA a Demand for Arbitration in which it contested its obligation to pay an invoice submitted by Hydro–Quebec for additional payments due for periods for which NEU had already paid Hydro–Quebec for power delivered. The June 11, 1996 invoice "called for payments of certain amounts alleged to be due [Hydro–Quebec] for energy deliveries going back to 1992." (Arb'r Dec. at 2.) Hydro–Quebec maintained that NEU had failed to include two "costs" in the AWN-FEC formula of the Contract over the course of several years and, therefore, had underpaid Hydro–Quebec for delivered electrical power. In response to NEU's demand for arbitration, Hydro–Quebec filed an answer, counterclaim and demand for arbitration of its own which sought resolution of the substance of the contested pricing issues.[4] (Id.)

The first disputed "cost" is associated with the transportation of natural gas, a fossil fuel.[5] At the time the Contract was drafted, "natural gas-fired generation was not a significant factor on the NEPOOL system . . . ." (Arb'r Dec. at 19. The Arbitrator found, however, that "[i]n recent years, natural gas has become an increasingly significant component of the fossil fuels burned in the NEPOOL plants." (Id. at 5.) The cost structure of natural gas, which is delivered by pipeline, differs in substantial respects from that of other fossil fuels. The cost of natural gas

> includes not only the cost of the commodity itself, but the expense of transporting the gas to the NEPOOL plants. This transportation expense has two parts: (1) the commodity component, which varies with the amount of gas actually delivered; and (2) the demand component, which is the amount paid in order to assure a given level of access to the pipeline's capacity. The demand component is a fixed charge, which must be paid regardless of the amount of gas actually carried in a given period. Thus, for instance, if a gas-burning plant were out of service for a month,

the demand component of the transportation charge would nonetheless be paid.

(Id.) Hydro–Quebec contends that the demand component (the "Demand Charges") should be included as part of the "total cost of fossil fuel burned" in the numerator; NEU maintains that such a "fixed" charge falls outside the transportation costs contemplated by the Contract.

The second disputed "cost" is labelled "NEEI Losses." The term refers to invoices billed to New England Power Company ("NEP") by New England Electric, Inc. ("NEEI") as amortization of "certain losses incurred annually by NEEI in connection with its activities in the oil and gas exploration business." (Arb'r Dec. at 28.) NEP is a NEPOOL Participant; NEEI is not. (See Contract Supp. III.) NEEI was organized by NEP's parent, New England Electric System, "to explore opportunities to obtain lower costs in the world fuel markets" and to "procure fuel for its affiliate, NEP." (Arb'r Dec. at 29–30.) NEEI never actually provided any fossil fuel to NEP, as planned, but rather only ended up selling fuel to non-affiliates and, in the process, incurred substantial debt. The NEEI Losses were the product of a debt financing arrangement between NEEI and NEP. "Under this contract, . . . NEEI passes through to NEP any profits or losses generated by NEEI's domestic oil and gas business. . . . With that mechanism in place, the credit of NEP was made available to support NEEI and several hundred million dollars of NEEI debt were obtained." (Arb'r Dec. at 31.) NEU insists that these exploration losses were not part of the "total costs of fossil fuel burned" under the Contract with Hydro–Quebec. Hydro–Quebec disagrees and demands their inclusion.

Pursuant to the Contract, the AAA designated Arbitrator Avery as the single arbitrator of the dispute. Eleven days of arbitration hearings were held in June 1997 in Boston. On October 10, 1997, the Arbitrator issued a 50-page Decision finding that NEU had properly excluded both types of costs

---

4. Two other disputes were arbitrated but have not been raised by either party here. Each involved a question of whether particular power plants (the "Milford Plant" and "Ocean State Power I and II") were part of NEPOOL.

5. The term "fossil fuel" is defined in the Contract as "all coal, gas or oil products burned in the generation of electricity." (Contract Art. 1.19.)

from the calculation of the Contract Energy price. NEU's Motion to Confirm the Arbitration Award under the Massachusetts Uniform Arbitration Act (the "Massachusetts UAA") was filed on October 14, 1997 in Suffolk County Superior Court. Mass.G.L. c. 251, § 11. Within 30 days, Hydro–Quebec removed the case here and moved to vacate the award as to both cost components pursuant to the arbitration clause of the Contract and the Federal Arbitration Act ("FAA"). 9 U.S.C. §§ 10–12.

## DISCUSSION

NEU presents two preliminary dispositive arguments that must be considered before the Court addresses the merits of Hydro–Quebec's motion to vacate the Arbitrator's award.

### A. Choice of Law

NEU first seeks to short circuit this dispute by urging the Court to deny Hydro–Quebec's motion to vacate as untimely under the Massachusetts UAA. Hydro–Quebec's motion was filed in this Court on November 21, 1997, 42 days after the Arbitrator's decision. The Massachusetts UAA requires that all motions to vacate "shall be made within thirty days after delivery of a copy of the award to the applicant." G.L. c. 251, § 12. Hydro–Quebec counters that the Federal Arbitration Act ("FAA") preempts state law in this dispute and that, therefore, motions to vacate "must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12.

■ While the FAA has some preemptive force, it does not entirely displace state arbitration law. "The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *see also Securities Industry Ass'n v. Connolly*, 883 F.2d 1114, 1117 (1st Cir.1989). Cases in which the FAA has preempted state arbitration law have generally focused on weeding out efforts by the states to "revivify the

ancient jurisdictional antagonism toward arbitration." *Securities Industry Ass'n*, 883 F.2d at 1120. As a result, the FAA preempts state laws that prevent parties from arbitrating disputes to the full scope of their agreements. *See, e.g., Allied–Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 281–82, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (holding that, in transactions involving interstate commerce, FAA preempted Alabama law which invalidated pre-dispute agreements to arbitrate); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 54–55, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (allowing arbitrator to award punitive damages because FAA preempted New York law to the contrary); *Raytheon Co. v. Automated Business Systems, Inc.*, 882 F.2d 6, 11 n. 5 (1st Cir.1989) (same).

■ The FAA does not preempt provisions of state arbitration law that set time limits on motions to vacate. *See Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1395–96 (D.C.Cir.1995) (holding that Connecticut 30-day provision "surely does not conflict with the FAA's 'primary purpose'") (quoting *Volt*, 489 U.S. at 479, 109 S.Ct. 1248). The First Circuit, in cases involving disputes over the applicability of the FAA's timeliness provision, has not even referred to preemption in resolving conflicting rules. *See Posadas de Puerto Rico Assocs., Inc. v. Asociacion de Empleados de Casino*, 873 F.2d 479, 484–85 (1st Cir.1989) (applying 30-day Puerto Rico rule with respect to arbitration in a Labor Management Relations Act dispute after conducting federal choice of law analysis); *cf. Prudential–Bache Securities, Inc. v. Tanner*, 72 F.3d 234, 238–39 (1st Cir.1995) (applying FAA 90-day rule after wrongful discharge arbitration because New York Stock Exchange arbitration rules, to which parties agreed, were silent on time to file motion to vacate). As a policy matter, since the state's different vacatur time limit does not interfere with the FAA's pro-arbitration policy, it follows logically that the FAA does not preempt state law on this basis. *Cf. Volt*, 489 U.S. at 487 (enforcing parties' selection by contract of California arbitration law where there was no interference with FAA policy).

■ Choice of law analysis, rather than preemption, resolves the issue of timeliness. Jurisdiction in this case derives not from the FAA, which does not provide an independent basis for subject matter jurisdiction, but rather from the diversity of the parties. *See New England Energy Inc. v. Keystone Shipping Co.*, 855 F.2d 1, 7 n. 6 (1st Cir.1988) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). "A federal court sitting in a diversity case must apply the choice of law rules of the forum state." *New Ponce Shopping Ctr. v. Integrand Assurance Co.*, 86 F.3d 265, 267 (1st Cir.1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *see also Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 3 (1st Cir.1998). In much the same way that the First Circuit resolved the timeliness issue in a federal question case by analyzing federal choice of law, this issue is resolved by asking which law Massachusetts courts would apply. *Cf. Posadas*, 873 F.2d at 480–81.

■ Applying Massachusetts choice of law analysis is not tantamount to applying the 30–day Massachusetts timeliness rule. Where appropriate, Massachusetts courts enforce choice of law provisions in contracts. *See Worldwide Commodities, Inc. v. J. Amicone Co.*, 36 Mass.App.Ct. 304, 307–08, 630 N.E.2d 615 (1994). The Contract invokes Quebec law both in its general choice of law provision and in the arbitration clause itself. *See* Sections 16.0 and 22.0. Quebec law on timeliness of arbitration vacatur motions states that an "application for annulment must be made within three months after reception of the arbitration award . . . ." Quebec Code Civ. P. Art. 947.4.[6] The provisions of this Title of Quebec law "apply to an arbitration where the parties have not made stipulations to the contrary." *Id.* Art. 940. However, Article 947.4, which sets forth the three-month limitation, is one of several provisions of the arbitration title that are "peremptory," meaning the parties to an arbitration agreement cannot stipulate away the

Quebec statute of limitations. *See id.* NEU argues that Article 947.4 is inapposite because it applies only to arbitration awards rendered in Quebec itself, but it cites no statute or caselaw in support. I conclude that Quebec law provides the statute of limitations and that the vacatur motion is therefore timely.

■ However, even if Quebec law were not controlling, the bottom line would be the same because Massachusetts courts would apply the FAA's timing provision to this dispute rather than that of the Massachusetts UAA. Absent a controlling contractual provision, a court must determine which limitation provision would otherwise be applied under Massachusetts law. Massachusetts analyzes choice of law problems using a "functional" approach. *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631–32, 473 N.E.2d 662 (1985). The functional approach applies with equal force to choices of statutes of limitations. *See New England Tel. & Tel. Co. v. Gourdeau Constr. Co.*, 419 Mass. 658, 664, 647 N.E.2d 42 (1995) (holding that Massachusetts courts are free "to apply the statute of limitations of another jurisdiction in particular circumstances"). Massachusetts considers not only which jurisdiction has the greatest "interest" in the issue, but also "various choice-influencing considerations." *Bushkin Assocs.*, 393 Mass. at 631, 473 N.E.2d 662.

Massachusetts choice of law analysis dictates the application of the FAA's three-month rule, instead of the Massachusetts UAA's 30–day rule, for two principal reasons. First, "the justified expectation of the parties" is an important choice-influencing factor. *Bushkin Assocs.*, 393 Mass. at 635, 473 N.E.2d 662. Here, the Contract does not provide that the shorter limitation period under the Massachusetts UAA would apply, and there is no indication that the 30–day limit was contemplated by the parties. The parties' contractual preference for holding arbitration hearings in Boston confers juris-

6. The Quebec Code appears to be the successor to the Civil Code of Lower Canada ("CCLC"), which applies by stipulation to the Contract. Since both parties cite to the Quebec Code on

this issue and neither questions its validity (though perhaps its force), the Court comfortably quotes it.

diction to confirm or vacate the award in Massachusetts court, but does not reflect the parties' choice of law governing statute of limitations. *See Baxter Health Care, Corp. v. Harvard Apparatus, Inc.*, 35 Mass.App.Ct. 204, 205 & n. 2, 617 N.E.2d 1018 (1993).

Likewise, NEU's attempt to convert the parties' consent to application of the AAA Rules into a consented-to choice of Massachusetts arbitration law confuses "jurisdiction" and "choice of law." Rule 47(c) of the AAA Rules states: "Parties to these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any *federal or state court* having jurisdiction thereof." NEU relies heavily on the underlined language. While a Massachusetts court may well have jurisdiction over this dispute, the parties' adoption of the AAA rules in a contract affecting interstate and foreign commerce does not support an inference of an intention that the Massachusetts UAA would be the statute governing the arbitration. *Cf. Raytheon*, 882 F.2d at 11 n. 5 (holding that adoption of AAA rules supported application of federal law on the authority of the arbitrator to award punitive damages even where the state chosen in the choice-of-law provision would have precluded them).

Second, another of the choice-influencing factors is the "[m]aintenance of interstate and international order." *Bushkin Assocs.*, 393 Mass. at 634 n. 7, 473 N.E.2d 662. Though NEU includes several Massachusetts companies, this case involves a Canadian corporation and corporations of other New England states. It also concerns the international purchase and transportation of electricity. FAA policy considerations do not dictate preemption in this case, but choice-of-law principles militate strongly toward the application of federal, rather than Massachusetts, standards governing the confirmation or vacation of an arbitrator's decision. Federal courts hold that the FAA applies as a general matter when interstate (and, surely, international) commerce is implicated. *See, e.g. New England Energy*, 855 F.2d at 4 n. 2; *Raytheon*, 882 F.2d at 9 (agreeing that since the arbitration clause under consideration was part of a contract which affected interstate

commerce, the FAA governed the analysis of policy to award punitives). Massachusetts courts also willingly cede ground to the FAA in matters involving commerce implicating parties beyond the Commonwealth. *See, e.g., Baxter Health Care*, 35 Mass.App.Ct. at 205 n. 2, 617 N.E.2d 1018; *Loche v. Dean Witter Reynolds, Inc.*, 26 Mass.App.Ct. 296, 300–01, 526 N.E.2d 1296 (1988). The Court by no means holds here that international transactions can never be subject to the Massachusetts UAA, but its preclusive application to an Canadian company's motion to vacate without any prior indication that the parties intended that Massachusetts substantive law would apply goes against the choice of law principles of Massachusetts.

Accordingly, Hydro–Quebec's motion is not barred by the Massachusetts UAA because the motion is timely under Quebec law or, alternatively, under the FAA.

### B. *Standard of Review*

NEU's next resistance to Hydro–Quebec's motion focuses on the validity and Court enforcement of a standard of review clause in the arbitration clause of the Contract. The parties agreed that "the decision of the Arbitrator shall be final and binding on all parties except that any party may petition a court of competent jurisdiction for review of errors of law." (Contract Art. 22.0.) Hydro–Quebec argues that this contractual language establishes this Court's standard of review under federal court interpretation of the FAA. NEU maintains that Hydro–Quebec's motion to vacate should be dismissed on the grounds that it relies upon the wrong standard. In place of the contractual provision, NEU argues that the Court can only review arbitration awards under statutory standards.

The FAA states that a district court may allow a motion to vacate an arbitrator's award in the following circumstances:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators . . . .

(3) Where the arbitrators were guilty of misconduct . . . or of any other misbehav-

ior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[7] The First Circuit has added to this list that "judicial review of arbitration awards is available where arbitrators have acted in manifest disregard of the law," a standard meaning that " 'it is clear from the record that the arbitrator recognized the applicable law—and then ignored it.' " *Prudential–Bache Securities, Inc. v. Tanner*, 72 F.3d 234, 239 (1st Cir.1995) (quoting *Advest, Inc. v. McCarthy*, 914 F.2d 6, 9 (1st Cir.1990). The First Circuit has not addressed a case, like this one, wherein parties agreed to expand the scope of judicial review by contract to include review for errors of law.

However, three circuit courts of appeals have directly addressed contractual expansion of the FAA's scope of review, and all three endorsed judicial review in accordance with the agreement of the parties. Most recently, the Ninth Circuit reversed a district court's refusal to review an arbitration award in accordance with contractual language allowing a court to vacate, modify or correct any award "where the arbitrator's findings of fact are not supported by substantial evidence, or ... where the arbitrator's conclusions of law are erroneous." *Lapine Technology Corp. v. Kyocera Corp.*, 130 F.3d 884, 887 (9th Cir.1997). The Fifth Circuit required a district court to review an arbitrator's award de novo where the arbitration agreement read that "errors of law shall be subject to appeal." *Gateway Technologies Inc. v. MCI Telecommunications Corp.*, 64 F.3d 993, 995 (5th Cir.1995). Finally, the

Fourth Circuit held that a district court "should have reviewed the arbitrator's legal conclusions de novo" where the arbitration agreement stipulated that "[t]he arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected by judicial review for any such error." *Syncor Int'l Corp. v. McLeland*, 120 F.3d 262 (table), No. 96–2261, 1997 WL 452245, at *6 (4th Cir. Aug.11, 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).[8] The Court is not aware of any federal case which actually interprets a similar arbitration clause and reaches a contrary result.

Each court of appeals based its decisions that such a contractual provision is acceptable on the principle, enunciated by the Supreme Court, that "[a]rbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." *Gateway*, 64 F.3d at 996 (quoting *Volt*, 489 U.S. at 479, 109 S.Ct. 1248); *see also Lapine*, 130 F.3d at 888 ("In short, 'arbitration is simply a matter of contract between the parties.' ") (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). Supreme Court decisions "make it clear that the primary purpose of the FAA is to ensure enforcement of private agreements to arbitrate, in accordance with the agreements' terms." *Lapine*, 130 F.3d at 888 (citing *Volt*, 489 U.S. at 478–79, 109 S.Ct. 1248). And, as the Fifth Circuit pointed out, the FAA, on its face, "does not prohibit parties who voluntarily agree to arbitration from providing contractually for more expansive judicial review of the award." *Gateway*, 64 F.3d at 997 n. 3, *quoted in Syncor*, 120 F.3d 262, 1997 WL 452245, at *6.

---

**7.** There is little difference between the statutory standard of review under Massachusetts and federal law. *Compare* Mass.G.L. c. 251, § 12 *and* 9 U.S.C. § 10(a). To the extent there could be a conflict, the choice of law principles discussed above and NEU's reliance on FAA precedent compel the choice of federal arbitration law to resolve the extent of the Court's review of the Arbitrator's decision. Incidentally, neither side suggests that Quebec law, which prohibits judicial review of the merits unless parties stipulate

to the contrary, governs here. *See* Quebec Code Civ. P. Arts. 940 & 951.1.

**8.** Fourth Circuit Local Rule 36(c) disfavors but does not prohibit the citation of unpublished dispositions, such as this one, in argument before the Fourth Circuit. Because of the permissive nature of the Rule and the persuasive value of the case, the Court concludes that reference is appropriate.

Though a quickfix method for avoiding involvement in the merits of this complicated dispute is tantalizing, the Court is convinced by these circuits' interpretation of FAA policy to permit expanded judicial review of arbitral awards by contract. The Fifth Circuit, for example, reasoned that just as the parties "may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted." *Gateway*, 64 F.3d at 996 (quoting *Mastrobuono*, 514 U.S. at 57, 115 S.Ct. 1212 and *Volt*, 489 U.S. at 479, 109 S.Ct. 1248), *quoted in Syncor*, 120 F.3d 262, 1997 WL 452245, at *6. The Ninth Circuit added that refusing to honor the parties' choice of an error of law standard "would make hostility to arbitration agreements erumpent under the guise of deference to the arbitration concept." *Lapine*, 130 F.3d at 889. "By confirming an award without the searching review that the parties have earlier agreed to, a court goes against the parties' wishes and does the opposite of what Congress intended." *Id.* at 890.

The only case NEU can point to in the United States of America suggesting a contrary result is *Chicago Typographical Union v. Chicago Sun–Times, Inc.*, 935 F.2d 1501, 1504–05 (7th Cir.1991),[9] where the Seventh Circuit considered an arbitration agreement which *did not* contain a provision expanding judicial review. Discussing review of the arbitrator's decision, Judge Posner wrote:

Federal courts do not review the soundness of arbitration awards. An agreement to submit a dispute over the interpretation of a labor or other contract to arbitration is a contractual commitment to abide by the arbitrator's interpretation. If the parties want, they can contract for an appellate arbitration panel to review the arbitrator's award. *But they cannot contract for judicial review of that award; federal jurisdiction cannot be created by contract.* . . . The court is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong.

*Id.* (emphasis added). The problem with relying on the quoted language is that there is no indication in the opinion "that the parties attempted to confer appellate jurisdiction on the court, nor does it even indicate that the parties had asked for some exotic standard of review." *Lapine*, 130 F.3d at 890. In fact, the dispute at issue in the case focused on alleged violations of an agreement to arbitrate a labor dispute by one of the parties, not on the level of judicial scrutiny given to an arbitrator's decision. *See Chicago Typographical*, 935 F.2d at 1503–05. "Thus, it seems that the court's cryptic assertion about jurisdiction is dicta." *Lapine*, 130 F.3d at 890. The passing advisory reference to limited judicial review in a different context simply cannot compete with the probing analysis by three other circuits in cases on point.

The First Circuit, though it has emphasized the narrow scope of judicial review, gives no indication that it would not follow the other circuits and allow the review in the Contract at issue here. The court, in cases *not* involving contractual agreements to expand review, has "long recognized the general rule that courts are not to review the merits of an arbitral award" and has held that "our review is circumscribed by the provisions of [FAA] Section 10(a) and the specifications of the 'manifest disregard of the law' test laid out by this court in *Advest*." *Prudential–Bache*, 72 F.3d at 239 n. 6 (internal quotations omitted). On the other hand, the First Circuit held earlier this year that "[a]lthough national policy favors the resolution of controversies through arbitration . . . , submission of disputes to this type of forum is totally dependent on the private will of the parties as embodied in whatever contract they have entered into." *MCI Telecommunications Corp. v. Exalon Industries, Inc.*, 138 F.3d 426, 428 (1st Cir.1998). Arbitrations "are strictly the product of voluntary contractual obligations." *Id.* at 428–29. The First Circuit has even cited with favor the Fifth Circuit's *Gateway* opinion for its "laying out the scope of judicial review of arbitra-

**9.** NEU additionally relied in its first memorandum of law on the *Lapine* district court opinion that was reversed by the Ninth Circuit after NEU filed its memorandum. *See Lapine Technology*

*Corp. v. Kyocera Corp.*, 909 F.Supp. 697 (N.D.Cal. 1995), *rev'd*, 130 F.3d 884 (9th Cir.1997). NEU properly notified the Court of the subsequent decision.

tion awards in the light of *First Options* and the FAA." *Prudential–Bache*, 72 F.3d at 237 (citing *Gateway*, 64 F.3d at 996). The Court's reading of the First Circuit ouija board supports the conclusion that the Court of Appeals would enforce the provision at issue in the Contract.

The Court would be remiss if it did not note two obvious problems with this outcome as a policy matter. First, one of the great benefits of arbitration is the efficient resolution of disputes without burdening both the courts and the parties with protracted litigation. Requiring courts to shift from a straightjacketed review of arbitral awards for problems such as corruption or other improprieties to more searching reviews for errors of fact or law could arguably transform arbitration "from a commercially useful alternative method of dispute resolution into a burdensome additional step on the march through the court system." *Flexible Manufacturing Systems Pty. Ltd. v. Super Products Corp.*, 86 F.3d 96, 100 (7th Cir.1996). However, the Supreme Court has unequivocally indicated its preference for accommodation of the intent of the parties over expediency by observing that "the basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, ... but to ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms." *First Options*, 514 U.S. at 947, 115 S.Ct. 1920. In fact, the Supreme Court could not have been more direct on this point: "We therefore reject the suggestion that the overriding goal of the [FAA] was to promote the expeditious resolution of claims." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

Second, allowing the courts to expand statutory standards of judicial review implicates a prudential question, that is, what control contracts should be permitted to have over the operation of the judiciary. The Ninth Circuit's concurrence in *Lapine* raises this concern but was content with the result so long as the contractual standard of review

did not require diversion from the courts' normal mode of operation:

> I would call the case differently if the agreement provided that the district judge would review the award by flipping a coin or studying the entrails of a dead fowl. Given the strong policy of party empowerment embodied in the Arbitration Act, I see no reason why Congress would object to enforcement of this agreement.

*Lapine*, 130 F.3d at 891 (Kozinski, J., concurring). Though the Court has not been asked to examine dead animals (except, of course, the fossil fuel) here, review of errors of Quebec law, most of which is written in French and which the Court lacks the computer-assisted or library resources to research independently, is not far off.[10] As will be seen *infra*, the issues of law here are thankfully straightforward, but it is not hard to imagine a case in which even error of law review is unrealistic, particularly where foreign law is implicated.

Despite these two reservations, the Court feels obliged to follow the thus-far unanimous rule of law in the federal courts. As stated in conclusion by the Fifth Circuit:

> Prudent or not, the contract expressly and unambiguously provides for review of "errors of law"; to interpret this phrase short of de novo review would render the language meaningless and would frustrate the mutual intent of the parties. When, as here, the parties agree contractually to subject an arbitration award to expanded judicial review, federal arbitration policy demands that the court conduct its review according to the terms of the arbitration contract.

*Gateway*, 64 F.3d at 997. Hydro–Quebec and NEU unambiguously agreed that "any party may petition a court of competent jurisdiction for review of errors of law." (Contract Art. 22.0.) NEU's attempt to invalidate that provision by appealing to the FAA, intended as an enabling statute for the crafting

---

10. My law clerk and a librarian ventured to the nether regions of the Social Law Library, the most comprehensive in Boston, and, after plowing through layers of dust and cracking the spines of untouched tomes of Canadian law, found no reliable compendium of the Quebecois Code.

of dispute resolution by contracting parties, fails.

## C. *Merits*

Having decided that the Court must examine the source of this conflict, it warily treads into the core of this international dispute. The Arbitrator decided that both Demand Charges and NEEI Losses should be excluded from the complex pricing formula contained in Supplement I of the Contract. In deciding in favor of NEU regarding these costs, the Arbitrator looked beyond the language of the Contract to consider substantial amounts of extrinsic evidence, including, most notably, prior negotiations and agreements between the parties.

 Hydro–Quebec asserts that the Arbitrator committed two legal errors in excluding these component costs from the calculation of the Contract energy rate. First, it argues that the Arbitrator erroneously found ambiguities in the Contract, which, according to Hydro–Quebec, plainly includes both component costs on its face. Second, Hydro–Quebec asserts that even if there is an ambiguity, the Arbitrator improperly considered prior negotiations and agreements of the parties in contravention of other specific language in the Contract prohibiting any such consideration. Both questions of contractual interpretation are appropriate inquiries for a federal court applying an error of law standard of review. *See Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 839–40 (1st Cir.1997) (defining "contract interpretation" as "a question of law for the court" but characterizing the resolution of competing interpretations of ambiguous contractual terms as a factual question). Beyond its FAA-based argument that the Court should not review the merits at all, NEU does not dispute that both questions are appropriate for "error of law" review.

### 1. *Contractual Ambiguities*

 As agreed to by the parties in the arbitration clause of the Contract, the Arbitrator applied Quebec law to the pricing dispute at issue before him. The parties stipulated that the Civil Code of Lower Canada ("CCLC") was to be applied to the merits of this dispute. The Arbitrator decided that, under the CCLC, "the starting place for resolving this dispute is the language of the contract." (Arb'r Dec. at 6.) He determined that the language of the Contract should control unless the contract was "ambiguous," in which case the following CCLC provision applied:

When the meaning of the parties in a contract is doubtful, their common intention must be determined by interpretation rather than adherence to the literal meaning of the words of the contract.

CCLC Art. 1013.

The Arbitrator concluded that the literal language of the Contract was inconclusive on the question of whether the two components of fossil fuel costs should be included in the calculation of the Contract energy rate. He found the Contractual term "total cost of Fossil Fuel burned" in the introductory paragraphs of Supplement I to be "ambiguous" in its application to both Demand Charges and NEEI Losses. (Arb'r Dec. at 8–9 & 28.) He also decided that one further term in Item 1 of Supplement I, "miscellaneous transportation costs," was ambiguous as well, preventing resolution of the dispute over Demand Charges based on a simple reading of the Contract. (*Id.* at 9–10.) The Arbitrator defined "ambiguous" as creating an "obvious doubt" as to the meaning of the contract language. *See Turenne v. Banque Nationale du Canada* [1983] J.E. 83–732 (C.A.) (opinion of the Court of Appeals of Quebec, written in French). This definition, pressed by Hydro–Quebec, is more rigorous than the mere "latent ambiguity" standard advocated by NEU. *See Richer v. LaMutuelle du Canada* [1987] R.J.Q. 1703 (C.A.)(also in French). The Arbitrator understood "obvious doubt" to mean that "the language is capable of two different and contradictory meanings, a standard conceded by [Hydro–Quebec] as requiring further inquiry in accordance with Quebec rules of interpretation." (Arb'r Dec. at 8.)

### (a) *"Total Cost of the Fossil Fuel Burned"*

The phrase "cost of the Fossil Fuel burned" appears three times in the opening paragraphs of Supplement I, twice modified by the word "total" and once unmodified.

First, "the total cost of the Fossil Fuel burned by NEPOOL Participants" is listed as the figure (in dollars) to be divided by the "total net energy generated from Fossil Fuel by the NEPOOL Participants" (in MWh) to obtain the AWNFEC. Second (and critically), the unmodified phrase appears immediately below in the following definitional sentence: "The *cost* of the Fossil Fuel *burned by each NEPOOL Participant* in any applicable twelve-month period *shall be summed* to yield the *total for NEPOOL* for such period." (emphasis added). An analogous sentence follows directing the "net electric energy" for each NEPOOL Participant to be "summed to yield the total for NEPOOL" to be used in the denominator of the AWNFEC calculation. Third, the Supplement's introduction concludes, "The total cost of the Fossil Fuel burned will be made up of the following four components." The rest of the supplement consists of several detailed pages explicating four "items" to be included within "the total cost of fossil fuel burned."

The Arbitrator's legal interpretation of these clauses, specifically the word "total," was that "[i]t is simply unclear what the parties meant when they used the word 'total' as an adjective defining 'cost.'" (Arb'r Dec. at 8.) He continues: "The word might have its everyday meaning as a reference to 'all' such costs. On the other hand, it might be meant in its arithmetic sense of summing the 'Fossil Fuel burned' costs of the NEPOOL Participants." (*Id.*) The Arbitrator recognized that "such a summing is required by the overall language of Supplement I" and noted the omission of "total" from the second "cost of the Fossil Fuel burned." (*Id.* at 8–9.) He found that the elimination of the modifier "total" in the second usage created a "patent and obvious doubt as to the meaning of the parties" and concluded that "total" could have been used "in the everyday sense or the arithmetic sense, or both." (*Id.* at 9.)

The Arbitrator's decision that the "total cost" phrases were ambiguous as used in Supplement I was, in my opinion, error. "Total cost of the Fossil Fuel burned" in the opening paragraphs of Supplement I can rationally mean nothing other than a summation of the "cost of the Fossil Fuel burned" of

each of the twenty NEPOOL Participants, as that term is further defined by the four subdivisions of Supplement I. Its meaning is not subject to "obvious doubt," that is, it is not capable of two different and contradictory meanings. Nor does the phrase contain a "latent ambiguity," the lower standard urged by NEU.

There are two reasons for this unambiguous reading. First, a reading of "total" in the supplement to mean "all" would be nonsensical in light of the four pages of definitions of what a "cost" is and, in some cases, is not. Costs are delineated under four "Item" headings: "Fossil Fuel Cost Delivered"; "Fuel Additive Cost"; "Fossil Fuel Unloading Cost"; and "Fossil Fuel Handling Cost." Each item contains further subdivisions detailing with specificity what each item's "cost" is composed of. While most of the item descriptions list component costs that are to be *included*, several items explicitly *exclude* certain costs, making a reading of the word "total" in its "everyday sense" as "all" inconsistent with the language it supposedly introduces. There is no meaningful way in which "total" can be read "as reaching with a broad sweep to include any expense associated with Fossil Fuel cost." (Arb'r Dec. at 8.)

In contemplating the "all" definition, the Arbitrator ignored the article of the CCLC directly following the "doubtful meaning" article on which he focused his legal reasoning:

When a clause is susceptible of two meanings, it must be understood in that in which it may have some effect rather than in that in which it can produce none.

CCLC Art. 1014. If "total" were to mean "all," as the Arbitrator supposes that it might, there would be little reason then to subdivide the definition of "costs of the fossil fuel burned" into four detailed parts, each explaining and delimiting which "costs" are to be included in the formula. This is true even of the last usage of "total cost," which is no paragon of careful draftsmanship. If the "total cost" meant "all" costs, it would not be necessary to indicate that it "will be made up of the following four components."

Second, interpreting "total" as "the sum of" makes sense in the Contract as a whole.

NEU is an association of twenty NEPOOL Participants. Each of them has a "cost of Fossil Fuel burned," which, as the second use of the phrase explicitly reads, "shall be summed to yield the total for NEPOOL ...." Even if the term "total" may be "susceptible" of two meanings, the summation usage clearly gives the term "effect" and therefore is the way in which it should be "understood." *See* CCLC Art. 1014. As the first stage of calculating the AWNFEC, NEU is to calculate the costs of fossil fuel burned for each NEPOOL Participant (each of which is a separate corporation) in accordance with the four Items in Supplement I. Then, NEU determines the numerator of the AWNFEC by adding the costs of each participant together to produce the "total cost." Though perhaps the Contract could have been written more precisely, the word "total" does not present the problem of ambiguity the Arbitrator found.

### (b) *Effect of Error on NEEI Losses*

 The Arbitrator's error, however, is harmless. On the issue of NEEI Losses, the Arbitrator relied exclusively on the ambiguity of "total cost" as his justification for delving into extrinsic evidence, on which he relied to exclude the fuel exploration cost. Because "total" means "the sum of" in the Supplement, the Items within the Supplement define the extent of "costs" includable in the AWNFEC calculation.

Hydro–Quebec has not, and certainly cannot, point to a single provision of the detailed listing of component costs of the fossil fuel burned that acts as a "hook" on which one could possibly hang losses attributable to fuel exploration and billed to NEP as part of a debt financing deal. The four items refer to aspects of the movement of fossil fuel to NEU facilities. Item 1 is "Fossil Fuel Cost Delivered," and each of the five sub-items in Item 1 refer to some aspect of the actual delivery of fossil fuel. Item 2 is "Fuel Additive Cost," which refers specifically to treatment of fossil fuel already delivered to one of the NEPOOL Participants' plants. Item 3 is "Fossil Fuel Unloading Cost," which specifically (and exclusively) refers to costs associated with "unloading Fossil Fuel from the

shipping facilities to a predetermined transfer point." Finally, Item 4 is "Fossil Fuel Handling Cost," which "includes all labor, supplies and expenses for handling all the Fossil Fuel from the transfer point or tank, or coal pile to the boiler plant."

The NEEI Losses which Hydro–Quebec seeks to include in the Contract Energy pricing formula are of an entirely different kind than any of these four Items. Therefore, the Arbitrator's ultimate decision to exclude the NEEI Losses is not at odds with the Court's conclusion that they should be excluded as a matter of contract interpretation.

### (c) *Effect of Error in Demand Charges*

 The legal error is also harmless as to the natural gas pipeline fixed Demand Charges because the Arbitrator properly found a further ambiguity that compelled a review of extrinsic evidence.

 To recap, the arbitrator found that the cost of natural gas includes transportation expenses to the NEPOOL plants which have two components: (1) the commodity component, which varies with the amount of gas actually delivered; and (2) the demand component, which is the amount paid in order to assure a given level of access to the pipeline's capacity (the "Demand Charges"). The Demand Charges are fixed, meaning they must be paid regardless of the amount of gas actually carried. As he considered whether the Demand Charges should be included in the AWNFEC formula, the Arbitrator found a further ambiguity in the terms "transportation costs" and "transportation charges" as used in Item 1 of Supplement I. He decided that the phrases left an "obvious doubt" as to whether they included the fixed demand pipeline charges. Though the Arbitrator noted that "the parties intended the [Hydro–Quebec] energy price to reflect transportation costs for Fossil Fuels, including natural gas," he decided that "the absence of explicit language sweeping all transportation-related costs into the price" required "interpretation" beyond the four corners of the contract. (Arb'r Dec. at 17.)

Unlike NEEI Losses, for which there is no hook in Supplement I, the Demand Charges

could arguably be added into the AWNFEC formula within Item 1 of Supplement I, "Fossil Fuel Cost Delivered," and therefore cannot be summarily excluded. Specifically, Item 1 contains the following language:

> This cost is the price at the NEPOOL Participant's receiving point, including freight and miscellaneous transportation costs. Fossil Fuel Cost Delivered includes such items as:

> \*　　\*　　\*

> b) Freight, barge, trucking or other transportation charges additional to net price paid to vendor not including, however, charges for unloading from shipping medium.

The language could be construed to include all "transportation" costs or charges not subject to an explicit exception—charges for unloading from shipping medium—which are dealt with separately and more explicitly in Item 3 of the Supplement. However, Supplement I lists "freight, barge, trucking" without mentioning "pipelines." This omission is poignant in a contract between sophisticated parties which otherwise is so specific in listing other costs, and raises an "obvious doubt" as to whether the parties had a common intention to include these fixed pipeline costs.

Moreover, the Arbitrator properly pointed out a critical problem which results in a "latent ambiguity" about whether the Contract includes the Demand Charges. Pipeline "commodity" charges vary with volume delivered and clearly are "transportation costs." In contrast, the Arbitrator noted as a matter of fact that "[a]ny given gas-fired plant could be out of service or not economically· dispatched and the cost level for gas pipeline demand charges would remain the same." (Arb'r Dec. at 17.) In other words, the Demand Charges may, in some instances, be charged to NEPOOL Participants regardless of there being no fossil fuel "delivered," in which cases Demand Charges would not be properly charged as transportation charges under Item 1.

That the use of such a general term in this context presents a latent ambiguity is apparent from even a cursory reading of legal disputes over natural gas costing. Courts have incorporated many different kinds of costs, including transportation and wide ranges of other fixed overhead costs, into either the demand or commodity component of pipeline charges, depending on a variety of factors including contractual language. *See, e.g., United Distribution Companies v. FERC*, 88 F.3d 1105, 1168–69 (D.C.Cir.1996), *cert. denied*, 117 S.Ct. 1723–24 (1997); *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 899–900 (D.C.Cir.1995); *cf.* Sherman S. Poland & Deborah A. Swanstrom, *Basic Principles and Structure of Natural Gas Pipeline Rate Proceedings*, Nat. Resources & Env't, Spring 1992, at 6, 8–9 (1992) ("A basic question in each rate proceeding is what proportion of a pipeline's fixed costs are to be assigned to the 'demand' component of a pipeline's rates, and what proportion, if any, of a pipeline's fixed costs are to be assigned to the 'commodity' component of a pipeline's rates.") The salient fact that this point is heavily litigated makes it unlikely that Demand Charges would have been so cavalierly adumbrated by the term "miscellaneous transportation costs," particularly when the other costs are spelled out in such anal detail.

Whether one looks at the face of the contract itself or its latent implications, the meaning of the term "transportation costs," standing alone, is hopelessly doubtful for the purpose of resolving the inclusion or exclusion of Demand Charges in the AWNFEC formula, which was drafted without the need to consider the economics of natural gas usage. Though Demand Charges could properly be termed "transportation-related costs," a phrase constructed by the Arbitrator, they do not fit cleanly into the "Cost of Fossil Fuel Delivered," as Hydro–Quebec argues. Therefore, despite the Arbitrator's error in finding the term "total cost" ambiguous, the obvious doubt and latent ambiguity as to how the Contract deals with Demand Charges required the Arbitrator to consider intrinsic and extrinsic evidence, as he did.

Hydro–Quebec's corollary argument that the Arbitrator exceeded his powers by "amending" the Contract by considering extrinsic evidence similarly fails.

## 2. Contractual Restriction on Extrinsic Evidence

Hydro–Quebec's second assertion of legal error is that Article XX of the Contract circumscribed the type of extrinsic evidence which the Arbitrator was permitted to consider. Article XX could be described as something of an "integration-plus" clause, which reads:

> This instrument shall constitute the sole and complete agreement of the parties hereto in respect of the matters herein set forth. All previous communications between the parties hereto, either oral or written, including without limitation the various drafts of this instrument, shall be of no force or effect *and shall not be used as a guide to the interpretation of this instrument.*

(Contract Art. 20.0 (emphasis added).) Hydro–Quebec argues that the Arbitrator improperly relied on prior communications between the parties in his "interpretation" of the parties' intentions about the inclusion or exclusion of Demand Charges and NEEI Losses after he found ambiguities. Since the Court has determined that there was no need to look to extrinsic evidence to exclude NEEI losses, it confines its analysis here to the effect of Article XX on the Demand Charges.

The Arbitrator, relying on analysis of Article 1013 by Quebecois courts and commentators, distilled five types of extrinsic evidence which he could, in general, consider following his conclusion that the meaning of the parties was doubtful from the face of the contract. The type of evidence most critical to this case is "[c]ommunications between the parties, both prior to the contract's execution and in connection with the disputed claim." (Arb'r Dec. at 11, citing *Richer v. LaMutuelle du Canada* [1987] R.J.Q. 1703–15 (C.A.)). The Arbitrator also concluded that Quebec law permitted him to rely on the general economic circumstances in which the contract was formed; the reasonable expectations and purposes of the contracting parties; the basic nature of the transaction; and the interpretation given to the contract by the parties during its term. (Arb'r Dec. at 11.)

Hydro–Quebec does not contest the Arbitrator's decision that, in general, all such evidence may be considered in the presence of ambiguities, but it takes the position that the clear language of Article XX precluded consideration in any prior communications of the parties in this case. The parties agree that Article XX is unambiguous on its face. "When the wording of a contract is unambiguous, the courts should not give it a meaning different from that which is expressed by its clear terms, unless the contract is unreasonable or has an effect contrary to the intention of the parties." *Scott v. Wawanesa Mut. Ins. Co.* [1989] S.C.R. 1445 (Supreme Court of Canada).

The Arbitrator decided that application of the language of Article XX in this case would violate both disjunctive prongs of the exception to the rule of enforcement, the force of which Hydro–Quebec acknowledges. First, the Arbitrator decided that it would be "unreasonable for the parties to contract, on the one hand, that their agreement was to be governed by Quebec law . . ., which puts heavy emphasis on looking to evidence of common intention to resolve disputes, while, on the other hand, contracting to deny their chosen tribunal access to the most obvious source of information as to that common intention." (Arb'r Dec. at 13.) Second, he decided that eliminating the most useful indicator of the parties' intention when faced with a contractual ambiguity "could well lead to a result contrary to the parties' intention." (*Id.*) In either case, he decided that Article XX should not be enforced by its terms.

Hydro–Quebec did not cite any authority construing an "integration-plus" clause under Quebec law. Without legal authority demonstrating that the Arbitrator erred in applying *Scott*, the Court agrees that the reading Hydro–Quebec gives to Article XX is unsustainable under either prong of *Scott* because it would eliminate virtually all evidence that sheds light on the common intention of the parties as directed by Article 1013 once it is determined that an ambiguity exists. Hydro–Quebec takes the position that *all* oral and written communications preceding the execution of the Contract in 1985 were off-limits to the Arbitrator's consideration. The

consequence of such a far-reaching exclusion would be not only to eliminate the actual contract negotiations between the parties but also, realistically, to eviscerate another key form of "interpretation" on which a fact-finder may rely: the reasonable expectations and purposes of the contracting parties. To consider this factor, the Arbitrator necessarily had to (and did) take into account "communications" between the parties.

*Ignoring* such evidence in a case like this would run the substantial risk of deciding what the parties intended without any reference whatsoever to their words and actions. In other words, the Arbitrator would be forced to put on blinders to the best forms of evidence concerning the parties' intent and rely only on weaker forms. In this case, most of what the Arbitrator would be left with would be subsequent conduct of the parties—found by him to be inconclusive— and whatever shreds of evidence about the parties' expectations and economic circumstances he might be able to glean from sources not involving a "communication" by one of the parties. Since Canadian law appears to permit the Court to set aside unambiguous contractual terms when they are "unreasonable," it was not legal error for the Arbitrator to do so in this case and to consider the full range of extrinsic evidence contemplated under the CCLC.

### 3. *Watt-ever*

Even if Hydro–Quebec had advocated a more reasonable reading of Article XX, i.e. that only actual negotiations and drafts pertaining to *this Contract* should be excluded, the Arbitrator's decision would not be error for the reason that he concluded that there was *no* explicit discussion and negotiation between the parties on this point. There were no prior drafts on the subject. The starting point for the Arbitrator's analysis of common intent was properly the contract itself:

> It is this choice of cost of Fossil Fuel *burned* in particular plants for the production of electrical energy during a particular period which the Arbitrator finds revealing on common intention. There is a clear common intention to base the energy price

on costs that were a function of the level of energy output of the NEPOOL Participant plants in a given period. It is that characteristic of a given cost—its relationship to the level of energy output—which lies at the core of the pricing bargain they expressed in the contract . . . . Thus, the basic pricing concept embedded in the contract language itself reveals an intention that the cost must causally relate to the level of energy output experienced by the NEPOOL plants.

(Arb'r Dec. at 10) (emphasis in original). Therefore, the parties' dispute over whether any error occurred in sidestepping Article XX was likely harmless. Without a full record of the proceedings before the arbitrator, however, a harmless error review on a claim of an erroneous evidentiary ruling is necessarily limited. Based on the record before me, which only includes a few affidavits, minimal testimony and documents, Hydro–Quebec has not demonstrated that the outcome would have been different without the limited reliance on previous communications between the parties which shed light on their reasonable expectations and purposes.

### 4. *Lights Out*

Hydro–Quebec, appropriately given the limited extent of this Court's review, did not challenge any of the factual conclusions that the Arbitrator drew from the array of extrinsic evidence he considered on the issue of Demand Charges. Since the Court has determined that the ambiguity in "transportation costs" as applied to the Demand Charges warranted the examination of extrinsic evidence, including prior negotiations and agreements, there is no legal basis to vacate the Arbitrator's decision to exclude Demand Charges. The Arbitrator's erroneous decision to consider extrinsic evidence on the issue of NEEI Losses was harmless given his decision to exclude them as well. This Court, as "the United States court in and for the district within which the award was made," is required to allow "an order confirming the award" where there is no cause, as here, to vacate or modify the decision of the Arbitrator. 9 U.S.C. § 9.

**ORDER**

NEU's Motion to Confirm the Arbitrator's award (contained within Dkt. # 1) is *AL-LOWED*. Hydro–Quebec's Motion to Vacate the Arbitrator's award (Dkt.# 2) is *DE-NIED*.

## APPENDIX A

| ANNEXE 1<br>Calcul du Coût pondéré annuel<br>de l'énergie fossile de NEPOOL | SUPPLEMENT 1<br>Derivation of Annual Weighted NEPOOL<br>Fossil Energy Cost |
|---|---|
| Le Coût pondéré annuel de l'énergie fossile de NEPOOL est établi d'aprés l'expérience réelle des Membres de NEPOOL durant la période de douze mois débutant le 1er septembre et se terminant le 31 août; il est égal au quotient obtenu en divisant | The Annual Weighted NEPOOL Fossil Energy Cost shall be based on the actual experience of the NEPOOL Participants during the twelve-month period starting September 1st and ending August 31st and shall be the quotient obtained from dividing |
| 1) le coût total des Combustibles fossiles brúlés par les Membres de NEPOOL pour la production d'énergie électrique durant ladite période de douze mois, par | 1) the total cost of the Fossil Fuel burned by NEPOOL Participants for the production of electrical energy during such twelve-month period, by |
| 2) l'énergie électrique nette totale produite par les Membres de NEPOOL á partir de Combustibles fossiles durant cette période de douze mois. | 2) the total net electric energy generated from Fossil Fuel by the NEPOOL Participants during such twelve-month period. |
| Les coûts des Combustibles fossiles brûlés par chaque Membre de NEPOOL durant toute période de douze mois applicable sont additionnés afin d'obtenir le total de cette période pour NEPOOL. | The cost of the Fossil Fuel burned by each NEPOOL Participant in any applicable twelve-month period shall be summed to yield the total for NEPOOL for such period. |
| Les quantités nettes d'énergie électrique produites á partir des Combustibles fossiles par chaque Membre de NEPOOL durant toute période de douze mois applicable sont additionnées afin d'obtenir le total de cette période pour NEPOOL. | The net electric energy generated from Fossil Fuel by each NEPOOL Participant in any applicable twelve-month period shall be summed to yield the total for NEPOOL for such period. |
| Le Coût total des Combustibles fossiles brûlés est constitué des quatre composantes suivantes. | The total cost of the Fossil Fuel burned will be made up of the following four components. |
| Premiére composante: | Item 1 |
| Coût des Combustibles fossiles livrés | Fossil Fuel Cost Delivered |
| Ce coût est le prix au point de réception du Membre de NEPOOL, incluantle frat et les divers autres coûts de transport. Le Coût des Combustibles fossiles livrés comprend des éléments tels que: | This cost is the price at the NEPOOL Participant's receiving point, including freight and miscellaneous transportation costs. Fossil Fuel Cost Delivered includes such items as: |
| a) Le prix net payé au fournisseur, á l'exclusion des coûts de financement et d'entreposage. Les escomptes pour paiement rapide, les revisions de prix basées sur la qualité des Combustibles fossiles et les frais de surestarie sont inclus. | a) Net price paid to vendor excluding financing and storage charges. All discounts for prompt payment, price adjustments for Fossil Fuel quality and demurrage costs are included. |

b) Les coûts de fret, barges, camions et autres coûts de transport qui sont en sus du prix net payé au fournisseur, sans inclure cependant les coûts de déchargement.

c) Les paiements à d'autres parties pour l'accostage des vaisseaux, pour la mise en place des wagons ferroviaires et leurs déchargement, ainsi, que pour la remise en disponibilité des transporteurs. Sont inclus les coûts de bateaux-remorques, de locomotives de triage, etc., lorsque ces coûts ne font pas partie du prix net payé au fournisseur.

d) Les frais encourus par le Membre de NEPOOL pour vérifier la qualité et la quantité des Combustibles fossiles tel que requis avant le déchargement. Sont inclus les coûts des services Saybolt, Martin et autres (mais la main-d'oeuvre du Membre de NEPOOL n'est pas incluse).

e) Les frais de douane, les taxes de vente, la commission de l'agent, les assurances ou les autres frais imporés à l'acheteur avant ou au moment de la réception.

Second composante:

Coût des additifs

Cette composante a pour but d'inclure:

a) Le couût des additifs ou des produits chimiques destinés à améliorer les caractéristiques de combustion des Combustibles fossiles.

b) Le coût des Combustibles fossiles utilisés (en marche) pour le démarrage ou la stabilisation de chaudiéres qui utilisent du mazout #6 comme principal combustible primaire.

Troisiéme composante:

Couût de déchargement des Combustibles fossiles

Ce coût comprend tous les frais de main-d'oeuvre, de fournitures et autres reliés au déchargement des Combustibles fossiles aux points de transfert convenus. Les points de transfert sont les entroits désignés à l'intérii-

b) Freight, barge, trucking or other transportation charges additional to net price paid to vendor not including, however, charges for unloading from shipping medium.

c) Payments to others for docking of vessels, placing of rail cars, shifting of same to complete unloading, undocking or release of carriers. Includes cost of tugs, switch engines, etc., when not a part of net price paid to vendor.

d) Cost to the NEPOOL Participant of verifying quality or quantity of Fossil Fuel as a necessary prerequisite to unloading. Costs of Saybolt, Martin or other outside services are included here (but not NEPOOL Participant's labor).

e) Customs fees, sales taxes, purchasing agent's commission, insurance, or other fees imposed on purchaser at or prior to time of receipt.

Item 2

Fuel Additive Cost

This item is intended to include:

a) Cost of additives or treatment chemicals to improve combustion qualities of the Fossil Fuel.

b) Cost of Fossil Fuel (while generating) used to ignite or stabilize a boiler burning #6 oil as primary fuel.

Item 3

Fossil Fuel Unloading Cost

This cost includes all labor, supplies and expenses of unloading Fossil Fuel from the shipping facilities to a predetermined transfer point. The transfer point is the common location in the Fossil Fuel handling system

eur du systéme de manutention des Combustibles fossiles ã la centrale ou â l'entreposage. Cette composante comprend des frais variables tels que:

a) Les coûts variables de main-d'oeuvre, de fournitures et autres pour décharger les transporteurs, aux lieux d'entreposage de l'utilisateur.

b) Les coûts variables de main-d'oeuvre pour la réception des vaisseaux, wagons ou autres véhicules de transport, le raccord des boyaux ou autres dispositifs de déchargement, la manoeuvre des vannes, la surveillance des niveaux des réservoirs, etc. durant le déchargement, la remise en disponibilité des véhicules de transport ã la fin du déchargement, etc.

c) Le coût de chauffage du mazout lorsque requis pour le déchargement, ã condition qu'on n'ait pas déjã du coût de production de l'énergie électrique.

d) Les coûts d'installation ou d'enlévement d'estacades autour des barges et des pétroliers pour le contrôle des fuites.

e) Les boyaux et autres fournitures non récupérables servant au déchargement du pétrole.

Quatriéme composante:

Coûts de manutention des Combustibles fossiles

Ce coût comprend tous les frais de main-d'oeuvre, de fournitures et autres liés ã la manutentin des Combustibles fossiles entre les points de transfert, les réservoirs ou les tas de charbon et la centrale. Sont inclus des frais variables tels que:

a) Les coûts variables de main-d'oeuvre (incluant les travaux d'écriture), de fournitures et autres li3s ã l'entreposage du pétrole et ã son transport d'un réservoir d'entreposage ã un autre, ou d'un réservoir ã l'entreposage ã un réservoir, de service.

b) Le coût de chauffage requis pour maintenir les Combustibles fossiles ã le température appropriée ã leur manutention et ã leur atomisation si on n'en a pas

from which Fossil Fuel being unloaded may be transferred to the boiler plant and/or to the fuel storage. This item includes variable expenses such as:

a) Variable costs of labor, supplies and other expenses for unloading carriers to the storage facility of the user.

b) Variable costs of labor to receive vessels, rail cars or other carriers, connect hoses, or other unloading facilities, tend valving, pumping tank levels, etc., during unloading, release carriers at completion of unloading, etc.

c) Cost of heating of oil, if required for unloading, and if not reflected in the computation of electric energy generated.

d) Placing or removing booms around barges or tankers for oil-spill control purposes.

e) Hoses or similar expendable supplies used for fuel oil unloading.

Item 4

Fossil Fuel Handling Cost

This cost includes all labor, supplies and expenses for handling all the Fossil Fuel from the transfer point or tank, or coal pile to the boiler plant. This item includes variable expenses such as:

a) Variable costs of labor (including clerical), supplies and other variable cost for holding oil in storage and transferring from storage tank, or from storage to service or day tank.

b) Cost of heating to maintain Fossil Fuel at proper temperature for handling and atomization if not reflected in the computation of electric energy generated.

74

tenu compte dans le calcul du coût de production de l'énergie électrique.

c) La main-d'oeuvre requise pour ajouter les additifs ou pour appliquer aux Combustibles fossiles les traitements nécessaires en préparation à leur utilisation, y compris l'exploitation des pompes, la manutention des additifs ou autres matériaux, etc.

c) Labor to supply additive or apply treatment procedures to Fossil Fuel in preparation for sue, including operating of pump, handling of additives, or other materials, etc.